Paul **VOGLER**, Jr., et al., Plaintiffs-Appellees,

v.

**McCARTY, INC.,** et al., Defendants.

**UNITED STATES** of America, Plaintiffs-Appellees,

v.

**LOCAL 53 OF** the **INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ASBESTOS WORKERS,** et al., Defendants-Appellees,

**Master Insulator's Association of New Orleans and Baton Rouge, La.,** Defendant-Appellant.

No. 71–1458.

United States Court of Appeals, Fifth Circuit.

Nov. 17, 1971.

Rehearing Denied Jan. 12, 1972.

Horace A. Thompson, III, Michael J. Molony, Jr., Jones, Walker, Waechter, Poitevent, Carrere and Denegre, New Orleans, La., for defendant-appellant.

Revius O. Ortique, Jr., New Orleans, La., Jack Greenberg, Norman C. Amaker, William L. Robinson, New York City,

Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Jerris Leonard, Asst. Atty. Gen., Herbert A. Goldsmith, Jr., Civil Rights Div., David L. Rose, David L. Norman, Acting Asst. Atty. Gen., Dept. of Justice, Washington, D. C., C. Paul Barker, Jerry L. Gardener, Jr., Dodd, Hirsch, Barker, Meunier, Boudreaux & Lamy, New Orleans, La., for appellees; Albert J. Rosenthal, New York City, of counsel.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal concerns the district court's equity jurisdiction to fashion remedies pursuant to Sections 706 and 707 of Title VII of the Civil Rights Act of 1964.[1]

Although the decision is simple, the facts are somewhat complex. We therefore begin by setting them out.

On May 31, 1967, the district court, based on its finding that the Union[2] had denied to Negroes opportunities for both employment referral and Union membership, ordered the Union to effectuate a system of alternate referrals of Negro and white workers and required it to develop a plan for the admission of new members based on factors other than race.

The parties to the original action were unable to agree on criteria for membership in the Union, and the referral system originally set up did not succeed in furnishing more than limited employment opportunities to Negroes. In order to resolve these problems, the district court, pursuant to proposals by the government, on February 19, 1970, entered a new order.

The February order provided in part that separate hiring books were to be maintained for four categories of employees: (1) White mechanics, (2) black mechanics, (3) white improvers, and (4) black improvers. As be-

1. 42 U.S.C.A. § 2000e–5 to –6.

2. Local 53 of the International Association of Heat and Frost Insulators and Asbestos Workers.

fore, the Union was to alternate referrals between Negro and white workers on a one-for-one basis. The order further provided that the Union could set up so-called "A" and "B" books for the white mechanics. Workers listed in the "A" book were to be those men with more than five 1200-hour years experience in the trade; workers listed in the "B" book were to be those men with less than five years of such experience. Referral preference could be given to workers listed in the "A" book.

The Union, on December 9, 1970, sought to modify the court order because of its alleged failure to accomplish the desired results in certain respects. Due to the influx of Negroes into the trade, along with a depressed economy which substantially affected overall employment opportunity in the building and trades industry, the system established by the court had created a substantial backlog of persons who were potential employees, but who had not been employed for long periods of time, or not at all. Full employment, because of the large number of employees in each seniority book, was thus impossible for a substantial number of workers. As a result of prolonged layoffs, many of the applicants appearing on the white mechanic lists had lost their eligibility for hospitalization and pension benefits.

To remedy this unstable employment situation and the accompanying effects on the white mechanics, the district court on January 25, 1971 entered the order involved in the instant case. This order substituted three lists of white mechanics, cited as groups A, B, and C, based on different periods of experience, in place of the previous two lists. This resulted in increased employment opportunity for the more experienced white employees at the expense of those white employees with less experience, and thus provided stable employment for at least some white workers. The order admittedly had no effect on the Negro work-

ers because the one-for-one referral system was preserved.

Appellant (Association) [3] contends that the district court had no discretion to enter this order, which affects only white Union members and which imposes on the Association terms of employment subject to collective bargaining between the Union and the Association.

■■ We note at the outset that district courts are possessed of broad discretionary power under Title VII of the Civil Rights Act to fashion remedies which prevent future discrimination and remedy the effects of past discrimination.

> In formulating relief from such practices the courts are not limited to simply parroting the Act's prohibitions but are permitted, if not required, to "order such affirmative action as may be appropriate."

Local 53 of the International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, Jr., et al., 5th Cir., 407 F.2d 1047. *See also* Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). The district court's discretion in preventing discriminatory practices and violations of federal law may even include orders affecting private agreements, including those under collective bargaining. J. I. Case Company v. NLRB, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944); Philadelphia, B. & W. R. R. Co. v. Schubert, 224 U.S. 603, 32 S.Ct. 589, 56 L.Ed. 911 (1912); Local 189, United Papermakers and Paperworkers v. United States, 5th Cir. 1969, 416 F.2d 980; Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers v. NLRB, 5th Cir. 1966, 368 F.2d 12.

■ Adequate protection of Negro rights under Title VII may necessitate, as in the instant case, some adjustment of the rights of white employees. The Court must be free to deal equitably with conflicting interests of white employees in order to shape remedies that

---

3. Master Insulator's Association of New Orleans and Baton Rouge, La., of which the defendant in the original district court action, McCarty, Inc., is a member.

will most effectively protect and redress the rights of the Negro victims of discrimination. We hold, therefore, that the district court, under the circumstances of the instant case, did not abuse its discretion in making reasonable adjustments between the various classes of white employees.

The Association further contends that the district court order will eventually harm Negro employment opportunity. For present purposes the order will cause no disadvantage to Negroes because referrals will continue to be made on a one-for-one basis. It may, however, affect the Negro workers when the Negro and white mechanics' lists merge, as is contemplated. If the seniority basis for referral is continued, it is feared that the "super-seniority" accorded the most senior white workers under the most recent court order might be used to give white workers hiring preference over the relatively new Negro workers.

Our disposition of the Association's first contention also takes care of this contention. Any harm to Negroes resulting in the future from the district court plan can be remedied by the district court's further exercise of the rather broad discretionary power with which it is endowed under Title VII. There is no indication at this time that such prejudice will occur or is likely to go without remedy.

Accordingly, we affirm.

CLARK, Circuit Judge (dissenting):

I have no doubt that the discretion of a trial judge attempting to afford effective relief to employees who have been the victims of unlawful discrimination is one of the broadest with which he is invested. We have said so time and again. United States v. Jacksonville Terminal Co., 451 F.2d 418 (*5th* Cir. 1971) [August 31, 1971]; Hutchings v. United States Industries, Inc., 428 F.2d 303 (*5th* Cir. 1970). But we have never said, and I cannot agree we should say now, that this discretion should be exercised for any reason other than to insure compliance with the Civil Rights Act. That was not the purpose of the order which, by this decision, we affirm. Indeed, the majority opinion states that the order "admittedly had no effect on the Negro workers because the one-for-one referral system was preserved."

An inevitable consequence of a court order which requires that more jobs be given to blacks than was previously the case, particularly where the total number of jobs actually available is on the decline, will be that fewer whites will be employed. However, compliance with the Act will frequently require this result. This may be regrettable because most, if not all, of the workers thus detrimentally affected played no part in the unlawful discrimination that necessitated the order. Be this as it may the problem of white worker job referral immediately poses not only the question of *how* the problem should be solved, but also *who* should work out the solution.

It seems to be an implied premise of the majority that since the court's order created the problem, the court should also be charged with solving it. I am unwilling to concede that the court created the problem. On the contrary, the problem was created by the discriminatory action of the employers and/or the union. A court should respond by taking steps necessary to both undo the effects of the past discrimination and also to prevent its future practice. But, that is all it should do. If effectuation of the court order also produces unsettling side effects—effects that would, in theory, have been present all along had the racial discrimination never occurred—then those effects should be settled and dealt with through the processes of collective bargaining. The vital importance of maintaining the integrity and utility of those processes is too well-established to require discussion or illustration here. It is sufficient to say that the courts have approved judicial interference with those processes—and this was the situation in every case the majority opinion cites—only where such interference was clearly necessary to avoid

a direct, inevitable, inexorable clash with the statutory mandate. We do not have such a situation before us.

Certainly it would be foolish to contend that the trial judge should fashion his corrective orders in a vacuum, or that he should be unmindful of the over-all employment situation before him or be insensitive to the effects—other than the elimination of the discrimination—his order is likely to cause. On the contrary, he should be fully informed of these other factors so that he can provide Title VII relief in such a way as to carry out the purposes of the Act while still doing the least possible tampering with other interests of the parties. That is not the thrust of the order now on appeal. It was designed only as a plan to deal with the non-racial effects of the initial collateral tampering. But it is not the only possible plan. There are others that the appellants for their part say they would prefer to see adopted. Without making a judgment as to the merit of any of these plans, I note that neither the one we are affirming, nor any of those appellants support, has anything to do with effectuating the purpose of, or insuring compliance with, the Civil Rights Act. This forces me to conclude that the selection and content of such a plan should come from free give and take between parties around the collective bargaining table, not from the chancellor's pen at the trial court bench.

If we are to uphold this order on the ground that it at least provides stable employment for some white workers, albeit at the expense of less experienced white workers, what is to prevent the district judge by authority of this decision, from rectifying the ill effects of this particular order by still another order that salaries be increased for those less experienced workers who are now working fewer hours? And then * * *? And then * * *? Once the court is permitted to dictate employment terms other than those absolutely necessary for the effectuation of the statutory purpose, we start an ex-

cursion on a downhill highway with no brakes. Eugene V. Debs, Samuel Gompers and John L. Lewis would be quick to advise the party who counts this case as won, that the subtle exchange of government by injunction for the right to bargain collectively will produce, at best, a Pyrrhic victory.

I would hold that the district court exceeded the ambit of its Title VII powers when it entered the injunction order here on appeal. I therefore respectfully dissent.