**Jake ROWE et al., Plaintiffs-Appellants,**

v.

**GENERAL MOTORS CORPORATION, Defendant-Appellee.**

No. 28959.

United States Court of Appeals, Fifth Circuit.

March 2, 1972.

As noted in footnote 2, the September 1, 1969 amendment contained no saving clause.

Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., for plaintiffs-appellants.

Charles Kirbo, R. William Ide, III, King & Spalding, Atlanta, Ga., Ross L. Malone, Gen. Counsel, General Motors Corp., Edmond J. Dilworth, Detroit, Mich., for defendant-appellee.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and INGRAHAM, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This appeal is taken from a judgment rendered for the defendant, General Motors Corporation, in a suit alleging racial discrimination in employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2.[1]

---

1. 42 U.S.C.A. § 2000e–2 in pertinent part provides:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or .

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*      *      *      *      *

(d) It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

*      *      *      *      *

(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

*      *      *      *      *

(j) Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number

Employees Jake Rowe, Willie Williams and Clarence Williams, Negroes, brought their charge of racial discrimination against GM's Atlanta plant (GMAD Lakewood plant), because of the system of transfer and promotion utilized by GM to determine which employees are suitable for transfer from hourly jobs to salaried jobs.[2] GM contends that the system by which men are promoted at the Atlanta plant is nondiscriminatory and also that it has an affirmative policy and practice of nondiscrimination which has been utilized to increase the opportunities for Blacks at the plant.

The Trial Court, sitting without a jury, determined that Employees individually, and the class represented in this suit had not in fact been the victims of racial discrimination.[3] We reverse the Trial Court's decision.

### Facts

At the outset it is appropriate to point out that until 1962 GMAD was wholly segregated with Blacks being limited to the few custodial jobs. In 1962 GM opened up all jobs to Blacks.

There are three distinct production activities at GMAD; [4] the Chevrolet passenger assembly line, the Chevrolet truck assembly line and the Fisher Body assembly line.[5] There are two main lines of employment. The hourly line covers certain jobs in the plant in which the workers are paid on an hourly basis. The salaried line covers other specified jobs in which workers are paid on a sal-

or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."

2. The relief sought by Employees in this action under 42 U.S.C.A. § 2000e–5 includes an injunction against future discriminatory practices, a declaratory judgment and damages amounting to the difference between the salaries the individual Employees have received while working at GMAD and the salaries they would have received had they not been the victims of racial discrimination. They also seek attorneys fees under 42 U.S.C.A. § 2000e–5(k).

3. This action was instituted by Appellant Jake Rowe as an individual action on his own behalf and as a class action under F.R.Civ.P. 23(a) (1). The class which is represented in this suit includes all Negroes similarly situated to Rowe and all present and future Black hourly rated employees at GMAD who suffered the discrimination in these employment practices. The other two Appellants, Clar-

ence Williams and Willie Williams, following the Court's refusal to allow intervention as a matter of right, filed their similar complaints at a later date. The Court ordered that all three suits be tried together with the Court considering all the relevant evidence in determining any and all of the three cases. All of the evidence was relevant to the class action.

4. In 1968, after the commencement of this suit, the GM Fisher Body plant merged with the GM Chevrolet-Atlanta plant. The result of this merger is the present GMAD Lakewood plant. The once separate activities of these two physically adjoining plants have since become coordinated under a single management staff. Employees who worked for the Chevrolet division prior to the merger now work under GMAD. For our purposes we treat all as one regardless of time. (There is some question concerning Jake Rowe's status with the GMAD plant and the Trial Court made no clear finding on this issue. This question, however, does not affect this Court's determination of the issues presented in this case.)

5. The detailed breakdown of the departmental structure at GMAD shows the following departments: Production (which includes body shop, paint, trim, chasis, and truck), Tooling, Engineering, Material, Purchasing, Scheduling, Traffic, Inspection, Work Standards, Personnel, Plant Protection, and Accounting.

aried basis. Most of the jobs in the hourly division entail work on the production lines while designated salaried positions [6] include foreman (supervisor),

6. By post-argument stipulation (at the Court's request) this was the current breakdown of salaried positions:

| Department | Clerk Classification | White | Black | Hired From Hourly Roll | Hired From Street | Foreman | White | Black |
|---|---|---|---|---|---|---|---|---|
| 05-Production Mgr. | 1 | 1 |  |  | 1 |  |  |  |
| 11-Body Shop | 1 | 1 |  | 1 |  | 16 | 16 |  |
| 15-Paint | 2 | 2 |  | 2 |  | 27 | 27 |  |
| 17-Trim | 2 | 1 | 1 | 2 |  | 32 | 30 | 2 |
| 25-Chassis | 2 | 2 |  | 2 |  | 31 | 30 | 1 |
| 28-Truck | 2 | 2 |  | 2 |  | 29 | 28 | 1 |
| 30-Tooling | 2 | 1 | 1 | 2 |  | 5 | 5 |  |
| 40-Engineering | 2 | 2 |  |  | 2 | 26 | 24 | 2 |
| 50-Material | 27 | 27 |  | 26* | 1 | 36 | 35 | 1 |
| 51-Purchasing | 3 | 3 |  |  | 3 | 1 | 1 |  |
| 60-Scheduling | 27 | 23 | 4 | 24* | 3 |  |  |  |
| 65-Traffic | 15 | 15 |  | 9 | 6 | 2 | 2 |  |
| 70-Inspection | 7 | 7 | 0 | 5 | 2 | 19 | 16 | 3 |
| 75-Work Stds. | 1 | 1 |  | 1 |  |  |  |  |
| 80-Personnel | 10 | 8 | 2 | 0 | 10 |  |  |  |
| 82-Plant Protection | 1 | 1 |  |  | 1 |  |  |  |
| 90-Accounting | 64 | 60 | 4 | 2 | 62 |  |  |  |
| TOTAL | 169 | 157 | 12 | 78 | 91 | 224 | 214 | 10 |

[A5607]

* Majority of these were Non-Bargaining Hourly Clerks and were made salary 2-1-69. Fisher Body carried all clerks as salary while Chevrolet carried material and scheduling clerks as hourly employees. When the two merged on February 1, 1969, the Chevrolet clerks in material and scheduling were transferred to salary as a group.

The stipulation includes this explanatory note:

"The following departments are included in the production department: body shop, paint, trim, chasis and truck. It is thus seen that the production department has nine clerks. Production clerks are hired for the most part out of production, that is, from the hourly workers in production. They compete with the other applicants but generally have an advantage, since a knowledge of the production line is helpful in performing their duties. Clerks in all other

clerk, accountant and security guard.[7] Some of the "clerk positions require typing skill while others do not.

There are two methods by which an hourly employee can secure transfer/promotion from his hourly job to a salaried job. The first requires no action on his part while the second can be called "employee initiated".[8] The employer initiated method, as the name implies, is one in which the whole opportunity depends on unilateral action of the employer. It starts by the immediate foreman recommending an hourly employee to the general foreman or to the salaried personnel administrator. This recommendation in turn is submitted to the Management Development Committee made up of ten persons. A majority vote of the committee is required to approve the employee's promotion.[9] The second method of securing promotion, the "employee initiated" method, puts the initiative wholly on the employee. Under it the employee makes application directly to the salaried personnel administrator. The administrator then directs the employee to obtain his immediate foreman's recommendation. When and as—but not until—the foreman's recommendation is furnished, the employee's name is submitted to the Management Development Committee. Again, a majority vote of the committee is required to approve the employee's promotion.

By whomsoever initiated the foreman is the key. In one the process never gets started, in the other it stops in its tracks unless the foreman puts his blessings on the prospect. This recommendation is based in part on the foreman's subjective evaluation of the hourly employee's "ability, merit and capacity." [10] Seniority is not a factor in determining who is qualified for promotion although "experience" is said to be an indirect consideration.[11]

Shortly before the trial of this case GMAD began notifying hourly workers of vacancies in the salaried division by posting notices of such vacancies in conspicuous places in the plant. Before this procedure was adopted, however, hourly employees were unaware of possible salaried job openings and were equally unaware of the qualifications necessary to obtain such jobs.

Each of the three plaintiff employees sought promotion/transfer from their hourly jobs on the production lines to salaried jobs by utilizing the "employee initiated" method. Among other things they base their charge of racial discrim-

---

areas are hired for the most part from the street, although applicants from the street and the hourly roll compete for the clerk positions. In the production area, there is a total of eight white clerks and one black, and in the areas other than production, 149 white clerks and 11 blacks. Out of the 222 foremen at the plant, 10 are black."

7. Positions in the accounting department other than the jobs given the "clerk" classification require some college training in accounting or a college degree. Vacancies on the plant security force are not filled from within the plant, but are rather filled from "outside" to prevent conspiracies among plant workers. We are therefore concerned, for the purposes of this decision, with only the opportunities for promotion from hourly jobs to the positions of foreman or clerk.

8. The terms used in explaining the methods or promotion in this case are merely descriptive of uncontradicted practices.

There are no specified directives, etc., which establish what we have termed the "company initiated" or the "employee initiated" methods of securing transfer/promotion.

9. Although the vote of the Management Committee is usually required to approve promotions, it was established at trial that the promotion of Appellant Willie Williams to the salaried position of temporary foreman was not approved by a majority vote of the committee.

10. The Trial Court also determined that the employee's attendance, medical and disciplinary records were important considerations. However, testimony established that the individual plaintiff employees' records were never compared with the records of hourly employees who were promoted to salaried jobs.

11. It was established that experience on the production line is beneficial in the performance of the duties of clerk in the production department.

ination on the foreman referral system and claim that because they are Blacks, they have been hindered in obtaining the required recommendation of their immediate foremen and have therefore been unable to secure promotion.[12]

### Discriminatory Employment Practices

■■ Title VII of the Civil Rights Act prohibits all forms of racial discrimination in all aspects of employment. Local 189, United Papermakers and Paperworkers, A.F.L.–C.I.O., C.L.C. v. United States, 5 Cir., 1969, 416 F.2d 980, 982, cert. denied, 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100. The degree of discrimination practiced by an employer is unimportant under Title VII. Discriminations come in all sizes and all such discriminations are prohibited by the Act. Hodgson v. American Bank of Commerce, 5 Cir., 1971, 447 F.2d 416, 420.

This Court has continuously given a wide scope to the act in order to remedy, as much as possible, the plight of persons who have suffered from discrimination in employment opportunities.[13] We have described this as "one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual's sharing in the 'outer benefits' of being an American citizen, but rather the ability to provide decently for one's family in a job or profession for which he qualifies or chooses." Culpepper v. Reynolds Metals Co., 5 Cir., 1970, 421 F.2d 888, 891.

■ It is now well settled that *any* form of discrimination in employment opportunities based upon race, color, religion, sex or national origin can no longer be tolerated. It is equally clear that any employment practices which operate to prejudice minority employees must be eliminated and their consequences eradicated by appropriate adjustments. The *only* justification for standards and procedures which may, even inadvertently, eliminate or prejudice minority group employees is that such standards or procedures arise from a non-discriminatory legitimate business necessity. Griggs v. Duke Power Co., 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; Local 189, United Papermakers and Paperworkers, A.F.L.-C.I.O., C.L.C. v. United States, *supra*.

Since this "legitimate business necessity" is the one and only justification for standards or procedures which operate to deny Blacks promotional opportunities, it is important to consider factors which have been deemed essential for a determination that a certain standard or procedure did not arise from a legitimate business necessity. The Su-

12. On the eve of trial, Willie Williams was promoted from his hourly job on the production line to the salaried position of Temporary Foreman. We are informed that after the trial Willie Williams was demoted to the hourly rolls again on the grounds that he did not possess the qualifications which are necessary to perform the duties of foreman. Clarence Williams has never been promoted from his hourly job and although Jake Rowe's status with GMAD is questioned, he has only held hourly jobs while at GMAD.

13. See Rogers v. E.E.O.C., 5 Cir., 1971, 454 F.2d 234; Vogler v. McCarty, Inc., 5 Cir., 1971, 451 F.2d 1236; Long v. Georgia Kraft Co., 5 Cir., 1971, 450 F.2d 557; United States v. Jacksonville Terminal Co., 5 Cir., 1971, 451 F.2d 418; Hodgson v. American Bank of Commerce, *supra*; Taylor v. Armco Steel Corp., 5 Cir. 1970, 429 F.2d 498; Local 189, United Papermakers and Paperworkers, A.F.L.–C.I.O., C.L.C. v. United States, 5 Cir., 1969, 416 F.2d 980, cert. denied, 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100; Weeks v. Southern Bell, 5 Cir., 1969, 408 F.2d 228; Pettway v. American Cast Iron Pipe Co., 5 Cir. 1969, 411 F.2d 998; Shultz v. First Victoria National Bank, 5 Cir., 1969, 420 F.2d 648; United States by Mitchell v. Hayes Intern. Corp., 5 Cir., 1969, 415 F.2d 1038; Local 53 of International Assn. of Heat and Frost Insulators and Asbestos Workers v. Vogler, 5 Cir., 1969, 407 F.2d 1047; Jenkins v. United Gas Corp., 5 Cir., 1968, 400 F.2d 28; Overnight Transportation Co. v. E.E.O.C., 5 Cir., 1968, 397 F.2d 368; Oatis v. Crown Zellerbach Corp., 5 Cir., 1968, 398 F.2d 496.

preme Court in Griggs v. Duke Power Co., *supra,* looked to three factors in determining that the promotional standards and procedures (industrial tests—high school diploma) complained of in that case did not arise from legitimate business necessity and therefore did violate Title VII. (i) The standards and procedures were not shown to be significantly related to successful job performance. (ii) The procedures operated to disqualify a substantially higher rate of Blacks than Whites. (iii) The jobs in question had formerly been filled by Whites as part of a longstanding practice of discrimination. Griggs v. Duke Power Co., *supra,* 401 U.S. at 426, 91 S.Ct. at 851, 28 L.Ed.2d at 161.

It is clearly not enough under Title VII that the procedures utilized by employers are fair in form. These procedures must in fact be fair in operation. Likewise, the intent of employers who utilize such discriminatory procedures is not controlling since "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." Griggs v. Duke Power Co., *supra,* 401 U.S. at 432, 91 S. Ct. at 854, 28 L.Ed.2d at 165.

■■■ It is therefore clear that employment practices which operate to discriminate against people because of their race, color, religion, sex or national origin, violate Title VII, even though the practices are fair on their face and even though the employer had no subjective intention to discriminate.[14]

### GM's Affirmative Policies of Nondiscrimination

■ Although we hold that GM has discriminated, we wish to make clear that this is not the case, typical of so many, in which an employer has had a deliberate purpose to maintain or continue practices which discriminate in fact under a facade of apparent neutrality and employment goodwill. Quite the opposite. But we think that it was the benign approach of GM which may unwittingly have led the Judge to his conclusions. As pointed out above, (see note 14, *supra*), as did the District Court in *Griggs,* he approached the case primarily in terms of purpose and motive, not in terms of consequence. But the problem is not whether the employer has willingly—yea, even enthusiastically —taken steps to eliminate what it recognizes to be traces or consequences of its prior pre-Act segregation practices. Rather, the question is whether on this record—and despite the efforts toward conscientious fulfillment—the employer still has practices which violate the Act. In this sense, the question is whether the employer has done enough. Of course, under an Act which is essentially enforced through private parties shouldering the burdens of private attorneys general, Jenkins v. United Gas Corp., *supra*; Miller v. Amusement Enterprises, Inc., 5 Cir., 1970, 426 F.2d 534, this court has the duty of directing appropriate legal action to the extent the employer's beneficent practices fall short.

But with this caveat it is appropriate to recognize the record of the General Motors Corporation and that of the Atlanta plant in recruiting and affirmative policies of nondiscrimination instituted by GM on a national scale and also at the GMAD Lakewood plant. This paraphrase of GM's brief is a fair statement of these efforts:

Through participation in programs such as Plans for Progress, sponsored

---

14. The Trial Court took the simple position that the employees failed to carry the burden of establishing that GMAD maintained a policy of discrimination in employment practices and that the Act clearly is "prospective and not retroactive in effect." (C.L. 2, 3). Undoubtedly, as his citation to the case reveals, he was greatly influenced by the District Court opinion in *Griggs* (D.C.N.C., 1968, 292 F.Supp. 243) which was modified by the Fourth Circuit (1970, 420 F.2d 1225) and reversed by the Supreme Court. By it the Supreme Court has made clear that the employer has the burden of showing that any given requirement which has a tendency to reduce job opportunity because of race has a demonstrable relationship to the employment in question. *Griggs, supra,* 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164.

by Vice-President Johnson in 1962, GH has entered into voluntary, affirmative action to aid minority groups. Non-discrimination indoctrination and training has been disseminated through policy letters, conferences, regional meetings, insertion of the policy in union contracts and through other means.

GM has participated in the Jobs Program of the National Alliance of Business Men and has accomplished much in hiring the hard-core unemployed, both whites and nonwhites. In less than a year, GM hired 208% of its quota, and the Atlanta plant hired almost 600% of its quota.

Since 1961, GM has had working agreements with ten predominantly Negro colleges and has extended assistance such as equipment, counseling, and summer employment for faculty members in order that the students of these colleges may have better opportunities for employment. Exchange agreements have been made so that college professors could work with GM, receive on-the-job training, and knowledge of its latest methods. GM has trained and recruited for employment the outstanding nonwhite students at these institutions. Numerous scholarship programs have been established by GM to aid nonwhites in their pursuits for higher education. This national policy has been adapted to the Atlanta plant, and many affirmative programs have been undertaken in the Atlanta area to recruit, train and employ nonwhites.

This record of the General Motors Corporation and that of the Atlanta plant in recruiting and hiring Blacks and other minority employees is commendable. But it bears emphasis again that this suit does not deal with racial discrimination in *hiring* practices. This suit pertains to how the system of promotion/transfer from hourly jobs to salaried positions of existing employees at the GMAD Lakewood plant is handled. Despite efforts and attitudes all should applaud, this Court must look to the actual employment practices at GMAD to determine if those practices operate as a barrier against the promotion/transfer of qualified workers from hourly jobs to salaried jobs. United States v. Jacksonville Terminal Co., *supra,* 451 F.2d at 450. As stated in *Griggs, supra,* 401 U.S. at 429–430, 91 S.Ct. at 853, 26 L.Ed.2d at 163,

"The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. *Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices.*"

(Emphasis added).

*Discrimination in Promotional Opportunities at GMAD*

■ It is frankly admitted by GM that prior to 1962 Blacks were not hired on the production lines at GMAD. This Court has determined that the promotion/transfer standards and procedures complained of have operated to "freeze" in this past discrimination to a significant extent. We accordingly disagree with the Trial Court's finding that the promotion/transfer procedures were not discriminatory.[15]

15. GM argues that the sole consideration for this Court is whether or not the factual findings of the Trial Court were clearly erroneous under F.R.Civ.P. 52(a). But as we have so often pointed out, Ferran v. Flemming, 5 Cir., 1961, 293 F.2d 568; United States v. Pickett's Food Service, 5 Cir., 1966, 360 F.2d 338; Dil-worth v. Riner, 5 Cir., 343 F.2d 226, and just so recently emphasized in a Title VII case, United States v. Jacksonville Terminal Co., *supra,* 451 F.2d at 423–424, this does not apply to findings made under an erroneous view of controlling legal principles. See also note 14, *supra.*

"Figures speak and when they do, Courts listen." Brooks v. Beto, 5 Cir., 1966, 366 F.2d 1, 9, cert. denied, 1967, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135. The figures are here vivid and significant.[16] They reveal—subject to GM's extenuating explanation—a great disparity in employment opportunities for Blacks which, at least so far as promotions/transfers to nonhourly jobs is concerned, shows that Blacks—perhaps in less numbers than the pre-1962 100%—do not get the same advances as do Whites.[17] Out of a total of 114 employees promoted from hourly jobs to salaried jobs between 1963 and 1967, only 7 were Blacks. Between 1967 and 1969, although 330 employees were promoted/transferred from hourly to salaried jobs, only 20 Blacks were promoted/transferred. Early in 1969, 35 hourly workers were promoted, 8 of this number were Blacks.

Actually GM cannot—does not—contest these raw statistics. Their extenuation is in (i) percentages [18] and (ii) the

16. Indicative, perhaps, of the Trial Judge's approach to the suit, no findings were made either as to the underlying facts or the legal significance of the actual post-1962 historic treatment of Blacks/Whites in promotion/transfers. The figures are —or with that absolutism once cherished before New Math should be—without much dispute. They all come from GM's records, and trying to lock simple arithmetic and adjudication into something less than orbital perfection, we think possible errors are of little consequence.

17. At the time of trial, only one Black was enrolled in GM's management training programs, designed to lead to employment opportunities in the salaried division. GM operates four such programs for the express purpose of developing management personnel. These programs are: General Motors Institute Co-op Student Program; College Graduate In-Training Program; Pre-Foreman training; and informal on-the-job training at the plant. From March 23, 1963, the date upon which Rowe started working, to February 22, 1967, GM promoted or transferred a total of 114 employees from the hourly rated jobs to the salaried division. Of this total, only eight of them were Blacks. Since February 1, 1967 to February 28, 1969, GMAD had and exercised 370 promotional opportunities to advance 344 whites and 26 Blacks. On the date of the trial, only 27 Blacks were employed in the salaried division of a total of 702 salaried employees.

In 1965, GMAD promoted approximately 41 or 42 employees from the hourly rated division to salaried jobs. Only one Black was promoted in 1965. Before July 2, 1965, GM promoted 12 whites, including three who were promoted on July 1, 1965. After July 2, 1965, thirty whites were promoted. Almost a year after Title VII became effective the first Black, C. S. Boyd, was elevated to timekeeper on June 1, 1966.

In 1966, the year in which the plaintiff employees last sought promotion without resorting to Title VII remedies, GM promoted a total of 29 employees. Two of them were Blacks. Before May 1966, GM promoted ten whites and afterwards 17 whites. Five whites were promoted to the position of Senior Clerk; two to clerk positions, and one to tabulator punch machine operator after May 1966.

In 1967, although promoting two Blacks, GM promoted 50 whites. The promotions were to varied job classifications.

After the merger on November 1, 1968 (see note 4, supra), there were approximately 148 promotions or intra-divisional transfers. Of these, only 11 went to Black employees. The balance of such promotions/transfers were awarded white employees. Prior to the merger GM promoted or transferred approximately 132 employees. Of this number, only six were Blacks. During the first two months of 1969, GMAD had promoted a total of 35 employees. Of these, eight were Blacks.

18. Although GM does not apparently challenge these body counts its brief attacks the percentages (not indicated by us) but the arithmetical purity hardly seems to refute the statistical showing of marked disparity:

Employment figures for GMAD with breakdown by nonwhites are

| March 1, 1966 | 2929 employees | 318 nonwhites |
| December, 1966 | 2354 employees | 231 nonwhites |
| March, 1968 | 2452 employees | 295 nonwhites |
| January, 1969 | 5239 employees | 741 nonwhites |

Between 1963 and 1967, 114 promotions were made with 7 of these being Negro. Between 1967 and 1969, approximately 330 promotions were made, with 20 of these being Negro. A vast majority of these promotions were made in 1968 to prepare for the second shift with many former supervisors who were demoted in 1966 being promoted back to supervisory

effect of historical "ebb and flow" of manufacturing output in the period 1964–1967.

As with *Jacksonville Terminal, supra,* figures of this kind, while not necessarily satisfying the whole case, have critical, if not decisive, significance—certainly, at least in putting on the employer the operational burden of demonstrating why, on acceptable reasons, the apparent disparity is not the real one. See, e. g., *Jacksonville Terminal, supra,* 451 F.2d at 450, 458. Here GM undertakes to do this by emphasizing the "ebb and flow" in production levels in GMAD as strikes or economic conditions caused fluctuations in vehicle production and consequent lay-offs and hirings.

■ We agree that this factor was appropriate for proof and evaluation. *Jacksonville Terminal, supra,* 451 F.2d 449. But a number of reasons compel us to reject it either as decisive or an adequate undergirding to findings which otherwise lack the F.R.Civ.P. 52(a) bolster. (See note 15, *supra*). Foremost is the fact that, starting with 1962 plant segregation and the policy of lay-offs and rehirings on some sort of "seniority" basis,[19] the disadvantage suffered by the Blacks hired after 1962 in lay-offs and rehiring is the direct result of the prior segregated policy. This is to make Blacks continue to suffer long after 1965, the effect of race discrimination long after Congress has forbidden it either in current application or as some sort of reincarnation of days gone by. Although GMAD could rightfully consider the position of Whites who had been laid off for these reasons[20] it could not—without more at least—treat the recently hired and governmentally twice emancipated Blacks as persons who once again had to go to the foot of the line.

Akin to this is the contention that "experience" was essential and only the long-employed Whites—and conversely, not the recently hired Blacks—had the "experience". Without gainsaying, as *Griggs, supra,* makes so plain, that *qualifications* are an employer's prerogative, the standards cannot be automatically applied to freeze out newly freed Blacks because for the years of its segregated policy GM hired no Blacks to afford them an opportunity to acquire experience. And on this GM—apart from its incantation of "experience" needs—made no effort to show that in these ebb and flow lay-offs and rehirings, that none of the affected Blacks was job-disqualified.[21]

■ With this background—which is either uncontradicted or based upon credible evidence which the Judge did not under controlling legal principles (see note 15, *supra*) discredit—we think it clear that the promotion/transfer procedures as applied violate Title VII in several particulars which can be briefly capsulated:

(i) The foreman's recommendation is the indispensable single most important factor in the promotion process.

(ii) Foremen are given no written instructions pertaining to the qualifications necessary for promotion. (They are given nothing in writing telling them what to look for in making their recommendations.)

(iii) Those standards which were determined to be controlling are vague and subjective.

(iv) Hourly employees are not notified of promotion opportunities nor are they

---

jobs. In early 1969, approximately 35 promotions were made with 8 being Negro.

19. "Seniority" as such ostensibly cuts no figure in promotions (although "experience" does). It does, however, apparently affect lay-off/rehiring.

20. In this analysis we are not faced with "rightful place" adjustments. See, e. g., Local 189, United Papermakers and Paperworkers, *supra,* 416 F.2d at 988.

21. In *Jacksonville Terminal, supra,* we stated, "although experience in a particular job or type of jobs can be a crucial determinant of qualification, the employer's (railroad terminal's) evaluation cannot be confined to railroad experience." 451 F.2d at 453. Skills and experiences obtained in other industries must be given credence in determining a Black employee's qualification for promotion/transfer or as here rehiring after lay off.

notified of the qualifications necessary to get jobs.[22]

(v) There are no safeguards in the procedure designed to avert discriminatory practices.

A brief consideration of some of the testimony of employees strengthens these conclusions. For example, Mr. Griswold, a foreman at GMAD, testified that he did not know what management was looking for in candidates for salaried jobs other than the job of foreman. Mr. Farnim, the GMAD Salaried Personnel Administrator, had to acknowledge that the methods for promotion/transfer at GMAD would enable an individual foreman, if he were so inclined, to exercise racial discrimination in his selection of candidates for promotion/transfer, and that, under the social structure of the times and place, Blacks may very well have been hindered in obtaining recommendations from their foremen since there is no familial or social association between these two groups.[23] ⟨All we do today is recognize that promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management.⟩ We and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discrimina-

tory action. See, Hawkins v. North Carolina Dental Society, 4 Cir., 1966, 355 F. 2d 718, 723–724; Cypress v. Newport News General and Nonsectarian Hosp. Assn., 4 Cir., 1967, 375 F.2d 648, 655; Meredith v. Fair, 5 Cir., 1962, 298 F.2d 696, 702, cert. denied, 1962, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66.

### The Class Action [24]

Although GMAD has voluntarily changed some of those procedures which formed the basis of Appellants' complaints, this Court still deems it necessary to render a Declaratory Judgment and also an injunction for the class. These voluntary changes do not render moot the questions presented in this litigation or make judicial sanctions inappropriate. See, Jenkins v. United Gas Corp., *supra*. In Cypress v. Newport News General & Nonsectarian Hosp. Assn., *supra*, 375 F.2d at 658, the Court stated, "protestations or repentance and reform timed to anticipate or blunt the force of a lawsuit offer insufficient assurance that the practices sought to be enjoined will not be repeated."

We therefore hold that GMAD has discriminated against Blacks in promotion/transfer in violation of the Act and a suitable injunction should issue. Although § 706(g) provides for injunctions of this type only where the employer has intentionally engaged in unlawful employment practices, this Court has held that "intentional" means only that

22. On the eve of trial GMAD started posting notices of openings in salaried jobs.

23. The following testimony was offered during trial by Mr. Maxwell Maddox, another foreman at the GMAD Lakewood plant:

"Q. Now, Mr. Maddox, you don't hold the same opinion about white people that you hold about black people, do you?
A. I don't hold any grudge against anybody.
Q. You don't have personal friends who are black do you?
A. Not no real close friends, no.
Q. And you don't intend to integrate a church or club, do you?
A. No.

Q. You mix and you get along better with white people, don't you?
A. I would assume we do. I have never had occasion to mix and mingle with colored people."

24. The District Court, Morgan, then District Judge, over strong protests of GM allowed the class action. F.R.Civ.P. 23 (b) (2) provides for the maintenance of a class action where "final injunctive relief with respect to the class as whole" is appropriate. This provision was particularly designed for civil rights cases, see notes of Advisory Comm., 39 F.R.D. 98, 102, and especially one where, on GM's own thesis, it is plant-wide practices, not just the employer *vis-a-vis* a single grieving employee.

the activity or practice was *not accidental*. *Local 189, United Papermakers and Paperworkers, supra*, 416 F.2d at 996. Nothing in the record in this case suggests that the use of these procedures was in any way accidental. The effect of our decision is also to grant appropriate declaratory relief.[25]

### Individual Plaintiff Employees

Since we determine in the class action, see Jenkins v. United Gas Corp., *supra*, that the system of promotion/transfer at GMAD discriminates against Blacks and in reaching that result we conclude that the District Judge misapprehended the significant legal principles and did not evaluate properly the marked historic disparity in treatment (pre-Act carried forward to post-Act) as to which GM failed to make an adequate explanation, we cannot fairly determine the individual cases. These must be remanded for reconsideration (on the present record or as expanded under the additional directions of the District Judge) in the light of this decision. This will, of course, include the appropriate remedy, backpay, limited or full, etc., as needed to effectuate the Act. And it will include for the successful class action (including this appeal) and any successful individual claim on remand, an allowance for attorneys fees.[26]

Reversed and remanded.

25. On oral argument this Court requested the parties to collaborate on and submit a proposed final decree for entry by the District Court *on the hypothesis* that the Trial Court's decision might be reversed at least in part. This mutually proposed decree, set out as Appendix A, presumably encompasses the changes in the GMAD promotion/transfer procedures which the parties conclude are necessary and adequate to effectuate the policies of the Act. Of course the District Court, on application or on its own part, has initial plenary power to enter such further orders as are necessary without leave of this Court.

### APPENDIX A
#### Proposed Decree

It is ordered, adjudged and decreed that the defendant shall continue to take certain affirmative action as hereinafter set forth designated, to implement defendant's policy of equal employment opportunity at its GM Assembly Division Lakewood Plant, Atlanta, Georgia, and to discharge defendant's obligations under law not to discriminate on the basis of race or color in the promotion or transfer of employees.

#### I.

Defendant shall continue its practice of periodically posting on bulletin boards in conspicuous places throughout its Lakewood plant notices announcing the formation of pre-foreman training classes or other training programs generally designed to equip employees with necessary skills for advancement to supervisory or other salaried jobs or to skilled trades work. Such notices shall remain posted for reasonable periods and will set forth information indicating how interested employees can make application for participation in such training programs.

#### II.

Defendant shall periodically post on bulletin boards in conspicuous places throughout its Lakewood plant notices which shall contain information with re-

26. 42 U.S.C.A. § 2000e–5(k) provides that the Court in its discretion may award reasonable attorneys fees to private litigants under Title VII. This Court recognizes the policy established by Congress which in effect makes citizens "private Attorneys General" when they bring actions of this nature. Newman v. Piggie Park Enterprises, 1968, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263; Pettway v. American Cast Iron Pipe Co., *supra*, 411 F.2d at 1005; Jenkins v. United Gas Corp., *supra*, 400 F.2d at 32–33; cf. Miller v. Amusement Enterprises Inc., *supra*, 426 F.2d at 538. This policy of "citizen enforcement" can best be encouraged by awarding attorneys fees to such private litigants.

spect to the qualifications required for entry level non-supervisory salaried positions and how and where application can be made.

### III.

Defendant shall continue its practice that no hourly rate employees and/or applicants for salaried employment at the Lakewood Plant shall be ·denied review or consideration for salaried employment by the Management Development Committee solely for the reason that they are not supported by the recommendation of their immediate supervisor.