**Jake ROWE, et al.**

v.

**GENERAL MOTORS CORPORATION.**

**Civ. No. 10391.**

United States District Court,
N.D. Georgia,
Atlanta Division.

June 14, 1984.

Fletcher Farrington, Savannah, Ga., Amy Totenberg, Atlanta, Ga., for plaintiff.

William A. Clineburg, Jr., Richard Snyder, Dan Heller, King & Spalding, Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This Title VII class action is before the court on Plaintiffs' motion for a finding of civil contempt. In an order entered September 22, 1982, this court found that Defendant had failed to comply with part of a consent decree entered herein on September 28, 1972 and directed immediate compliance. 550 F.Supp. 214 (N.D.Ga.1982). However, the court otherwise deferred ruling on Plaintiffs' motion.

The relevant facts are set forth in the September 22, 1982 order and will not be repeated herein except briefly. Basically, the consent decree required that Defendant post notices at its Lakewood, Georgia plant, giving information with respect to the qualifications required for "entry level non-supervisory salaried positions."[1] Defendant thereafter posted notices which did not contain information with respect to qualifications for these positions. Plaintiffs seek a compensatory fine in favor of members of the class. The class is defined as all black hourly paid workers at Defendant's Lakewood, Georgia plant between February 4, 1966 and September 28, 1972. The thrust of Plaintiffs' argument is that Defendant's failure to comply with the consent decree reduced their chances of getting entry level salaried jobs which would have placed them at the bottom "rung" of Defendant's management ladder. In an order entered April 4, 1984, 586 F.Supp. 365, the court directed the parties to brief the issue whether imposition of a compensatory fine would be appropriate.

Defendant's brief makes two points. First, Defendant argues that Plaintiffs have failed to prove that they were harmed by Defendant's noncompliance; moreover, Defendant contends the evidence affirmatively shows Plaintiffs were not harmed. Secondly, Defendant argues that the nine-year delay between entry of the 1972 decree and Plaintiffs' 1982 filing which brought the noncompliance to the court's attention augurs against imposition of a compensatory fine.

Plaintiffs' brief implicitly concedes that they have not proven damages in any specific amount. However, Plaintiffs contend sufficient proof of general harm has been shown to justify an award in an amount deemed reasonable by the court. They point to testimony given by class members W.H. Leonard, Herman Johnson, Clayborn King and Kelley Stroud at the contempt hearing. Each of these black employees testified that specific information concerning qualifications for entry level nonsupervisory salaried positions would have been helpful to them at times when they were hourly paid employees hoping to gain salaried employment. Plaintiffs further point out that most class members did not have notice of the *Rowe* decree; therefore, they

---

1. As is explained hereinafter, "entry level non-supervisory salaried positions" actually means "nonunion hourly clerical positions." The class members on the other hand are unionized hourly plant workers.

cannot be blamed for failure to monitor enforcement of the decree.

■ Having considered the parties' briefs, plus evidence received at hearings held in this case on July 23, October 22 and November 12, 1982, the court now declines to assess a compensatory fine against Defendant in favor of the Plaintiff class. The court's reason is unrelated to the issue of contempt per se. The posted notices clearly do not comply with the 1972 order; the necessary element of intent is readily inferable from the notices themselves, plus the clear wording of the decree. However, this is not a criminal contempt proceeding. The only function of a fine in a civil contempt case involving a prior, non-continuing violation is compensation.[2] *See In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir.1980).[3] If compensation is inappropriate, a contempt adjudication would serve no purpose. The court must therefore analyze Plaintiffs' proof to see if harm has been satisfactorily proven.

■ The court begins its analysis by noting again that information with respect to job qualifications is presumptively valuable to job seekers. Of course, such information is no guarantee that a desired job can be obtained or that an actual job opportunity exists. However, such information frequently enhances a job seeker's chances of getting an available, desired position by some incremental amount. It may enable him to obtain necessary training; it may give him confidence that he possesses the skills necessary for the job. That incremental advantage, when multiplied by the financial gain associated with the new position, represents the value of the job qualifications information. That the precise fig-

ures are difficult of ascertainment does not mean they do not exist.

Moreover, the court notes the broad equitable powers conferred on it in Title VII cases. It is confident that in any given case involving the value of job qualifications information to a Title VII plaintiff, it could choose a figure that would do justice to both sides. Thus, if a fine were otherwise appropriate in this case, the court could award each class member a certain amount for each month in which he or she remained an hourly paid employee between September 28, 1972 (entry of the original decree) and September 22, 1982 (entry of order finding noncompliance with the decree).[4] The monthly dollar amount would approximate the monthly value of such qualifications information, given the availability of "entry level non-supervisory salaried positions," and the extent to which class members as a whole may be presumed to have been interested in these jobs.

The court's concern is not imprecision, but rather the issue of whether the harm sustained by class members is substantial enough to justify an award. As noted, there is a direct correlation between the value of job qualifications information on the one hand and the existence of job openings, as well as the desirability of the job(s) involved on the other hand. If absence of openings or other factors significantly reduce the actual value of this information in the instant case, the court would not engage its resources to distribute merely nominal amounts to individual class members. The evidence bearing on the issue of substantiality will now be examined.

Between February 1966 and December 31, 1981, 310 of Lakewood's hourly employ-

---

**2.** Defendant was directed to take corrective steps by *Order of September 22, 1982, 550 F.Supp. 214,* and did so.

**3.** Decisions of the Fifth Circuit handed down prior to September 30, 1981 are binding precedent unless overruled or modified by the Eleventh Circuit en banc. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

**4.** Although the evidence on this point is not fully developed, the court's impression is that Defendant has no general requirements for plant workers to be eligible for salaried positions. Therefore, it appears the entire pre-decree black hourly work force is includable in the pool for "entry level non-supervisory salaried positions."

ees moved into salaried positions.[5] 213 of these promotions occurred before entry of the decree in September 1972. 97 such promotions occurred between September 1972 and December 31, 1981.[6]

The part of the 1972 decree relevant here is the portion pertaining to posting of qualifications required for "entry level *non-supervisory* salaried positions." (emphasis supplied). Of the 310 promotions referenced, only 69 were to such non-supervisory positions. Only 18 of the 69 occurred between entry of the 1972 decree and December 31, 1981.[7] While the record does not disclose the total number of persons hired from all sources for "entry level non-supervisory salaried positions," it is clear that Defendant placed very few hourly workers, whether white or black, into these

positions during the 9-year period following entry of the *Rowe* decree.

Neither side has addressed or sought to explain this phenomenon. Thus, the court can only speculate as to possible causes. One possibility is that Defendant has chosen to concentrate its hiring for "entry level non-supervisory salaried positions" in off-the-street hiring. Another possibility is Defendant has had relatively few openings for these positions since 1972.[8] Yet another possibility is that during this 9-year time interval, hourly employees found entry level, non-supervisory salaried positions less attractive than they did previously. In this regard, the court notes that hourly plant workers are unionized. Salaried workers are not. "Entry level, non-supervisory salaried positions" are mostly clerical.[9] They really are not "salaried" in the usual sense of the word.[10] They are hourly paid[11] jobs

---

5. Plaintiffs' brief criticizes Defendant's statistics as being inconsistent with those cited by the Court of Appeals for the Fifth Circuit in *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972). The Fifth Circuit noted that "Since February 1, 1967 to February 28, 1969, GMAD had and exercised 370 promotional opportunities to advance 344 whites and 26 blacks." *Id.* at 357, n. 17. *See* Plaintiffs' brief filed June 11, 1984, at p. 9. The court, however, finds no necessary discrepancy between the data tendered in the 1982 hearings and that referenced in the Court of Appeals' opinion. The Court of Appeals did not state that the 370 promotional opportunities were all instances where hourly employees transferred into the salaried ranks—a limitation expressly observed by Defendant's 1982 data referenced herein. Moreover, defense witness Bryant DeWitt pointed out during his testimony in the original *Rowe* trial that not all of these personnel selections represented transfers from hourly to salaried. He noted that they included new hires, reassignments, and lateral transfers. *See* transcript of *Rowe* trial held on March 24–26, 1969 (Henderson, J. presiding) at p. 261. *See also* Update of Answers Filed to Plaintiffs' First Interrogatories, filed March 6, 1969, answers to interrogatories nos. 21–22; 31–32 (admitted into evidence at trial as Plaintiffs' exhibits nos. 15 and 16). A careful reading of footnotes 16, 17 and 18 in the Court of Appeals' opinion makes it clear that the figures noted do not represent findings of fact. Indeed, the court noted that no findings of fact had been made with respect to this statistical evidence. Rather, the court indicated that the disputed aspects of the statistics were not substantial enough to deprive them of probative weight.

6. Blacks represented 11.2% of the promotees in the period preceding entry of the decree, and 21.65% of the promotees between entry of the decree and December 31, 1981.

7. Blacks received 17.39% of the 51 promotions which occurred prior to entry of the decree, and 38.89% of the promotions made thereafter.

8. In 1972, Lakewood had about 680 salaried employees. By the end of the 1973–74 layoffs, the salaried work force was down to under 400 employees. It expanded again to over 600 employees by 1979, but then was cut back by a third in the 1980 layoffs. Laid off salaried employees have recall rights based on seniority, *i.e.*, in reverse order of layoff. Therefore, at least for certain periods in between 1972 and 1981, Defendant would have been in a position to fill quite a number of jobs through its recall list.

9. Within Defendant's pay classification system, these are level 4 and 5 jobs. Supervisory jobs begin at level 6 or 7, depending on the department. The plant foreman jobs which were also the subject of the 1972 *Rowe* decree are level 6 supervisory jobs.

10. Throughout the *Rowe* litigation, both sides have referred to these clerical jobs as "salaried" and the unionized plant workers as "hourly." More descriptive labels would be "nonunion hourly clerical employees" and "unionized hourly plant workers." However, because the parties have used the "hourly" versus "salaried" labels to distinguish between these groups of employees, the court continues to use the same terminology in this order.

where the company has chosen to express pay as a monthly amount. Although the evidence showed instances where plant workers became clerical employees and got raises, there is insufficient evidence to conclude that "entry level, non-supervisory salaried positions" generally offer pay and benefits greater than pay and benefits available to hourly plant employees.[12]

Because this is a class action, the court must necessarily deal in generalities in determining whether class members sustained more than nominal harm because of Defendant's noncompliance with the referenced portion of the 1972 decree. Based on the evidence, the court is not convinced that the average class member was more than nominally harmed by Defendant's failure to properly post the qualifications notices. In this connection, it notes again Plaintiffs' long standing indifference to proper compliance. The evidence showed that some class members did know about the requirements of the *Rowe* decree, saw the deficient posted notices and did nothing. While the court does not find that this failure constitutes an estoppel to the class as a whole, it is evidence from which the court infers that under the circumstances existing between 1972 and 1981, class members did not find the lack of information particularly harmful—indeed, not harmful enough to warrant contacting their attorneys.

In accordance with the foregoing, Plaintiffs' motion for a finding of civil contempt is hereby DENIED.

---

11. These jobs are not treated as exempt from the overtime requirements of the Fair Labor Standards Act.

12. Undoubtedly, there are some hourly plant employees who would choose clerical jobs regardless of whether this would mean a substantial raise. Some might simply prefer office work; others might view the entry level "salaried" jobs as a stepping stone to higher management positions. However, the court's inquiry is directed to assessment of the interests of the class as a whole.