James R. MacRAE et al., Plaintiffs,

v.

Thomas F. McCORMICK, Defendant.

Civ. A. No. 76–1911.

United States District Court, District of Columbia.

July 19, 1978.

Peter R. Kolker and Judith Munger, Washington, D. C., for plaintiffs.

Michael J. Ryan, Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM

GASCH, District Judge.

Plaintiffs James R. MacRae, Jesse Hamilton, and Bruce Carter, three black journeymen employed in the Composing Division of

the Government Printing Office (GPO), bring this action under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16, against the Public Printer. Plaintiffs assert individual claims and claims on behalf of the following class:

> All current black employees of the Composing Division of the Government Printing Office in the metropolitan Washington, D. C. area who have applied for and have been, subsequent to March 24, 1972, or are being denied promotions, training opportunities, or transfers because of defendant's alleged discriminatory practices and policies.

Order of November 30, 1977. Plaintiffs allege that, because of the pattern and practice of racial discrimination at the GPO, they and members of the class have been denied equal opportunity to training, transfers, and promotions. This matter having been tried to the Court on December 7–13, 1977, the Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. INTRODUCTION.

The GPO provides printing services for the federal government, procures outside printing services, and engages in the sale of documents. The GPO is composed of the Documents Department, Management and Administration Department, Customer Service Department, Printing Procurement Department, Production Department, Quality Control and Technical Department. The Production Department, responsible for the internal production of documents, is divided into the Composing Division, Letterpress Division, Electronic Photocomposition Division, Offset Division, Binding Division, and Office of the Production Manager.

The Composing Division, with which this lawsuit is concerned, employs approximately 1,400 employees and is the largest division in the Production Department. The function of this division is to transform the raw copy into printed materials. A majority of the employees in the Composing Division are involved in the production of the Congressional Record and the Federal Register. The Composing Division is divided into the Linotype, Monotype, Patents, Job, Hand, and Proof Sections.

There are several different job classifications and pay levels within the Composing Division. Approximately 1,100 of the 1,400 Composing Division employees are journeymen. To qualify as a journeyman, an individual must have completed a GPO apprenticeship program of at least four years or equivalent training in the private industry. Such training provides an individual with a general knowledge of the composing aspect of printing and qualifies him to work as either a hand compositor, linotype operator, monotype machinist, or printer proofreader. Journeymen are paid at the basic rate of $10.78 per hour; however, journeymen on the night shift earn fifteen percent more per hour.

There are presently approximately ninety-five employees above the journeyman level in supervisory and "uprate" positions. Uprate positions require greater responsibilities and therefore pay at a higher hourly rate than journeymen positions. Supervisory positions include a superintendent, two assistant superintendents, twelve foremen, and fifteen assistant foremen.

The job categories below the journeyman level are the monotype castermen and the printing plant workers (PPWs). The monotype castermen operate the monotype casting machines, which produce pieces of lead type. The monotype castermen position is considered "sub-craft," because a monotype casterman performs only one aspect of the printing process and does not need a broad knowledge of the printing process. Monotype castermen generally receive seventy percent of the hourly rate for journeymen. Nearly all of the fifty-four monotype castermen in the Composing Division are black.

The PPWs are semi-skilled or unskilled laborers who perform the heavy work and otherwise assist the journeymen. The PPWs are paid on a different pay scale than the craft workers. Nearly all of the 130 PPWs are black.

The employment structure and policies of the GPO (and, in particular, the Composing Division) are largely determined by its unique function and budgetary system. Its major purpose is to meet the printing needs of Congress and federal agencies. Unlike other legislative or executive branch organizations, its function is to produce material goods rather than operate in an administrative capacity. Both because the GPO must constantly meet production deadlines and operates on revolving funds, it is tightly staffed and budgeted. Each job classification has specific skills and requirements. The skills required for PPW or monotype casterman positions are not similar to those required for journeyman positions. Thus, employment as a PPW or monotype casterman is not contemplated to and does not lead to employment as a journeyman. In other words, there is no career ladder between the positions of PPW or monotype casterman and journeyman. Furthermore, employment as a journeyman for a given number of years does not automatically lead to promotion to an uprate or supervisory position. Competition for these higher level positions is keen, particularly since most of the Composing Division employees are journeymen and many journeymen remain employed at the GPO for a long period of time.

The technological change that the GPO is experiencing also influences its employment policies. The Composing Division presently utilizes the "hot metal" technique for most of its production. Under the "hot metal" process, "pieces of type are cast from molten metal and set by machine or composed by hand into printable form, proofread and sent on to offset or Letter Press Division for printing." The "cold type" process, which is undergoing development, is utilized in the Electronic Photocomposition Division. Under this process, "copy is keyboarded on video consoles and electronically photo-composed by computer, without the use of metal type." Defendant's Proposed Findings of Fact and Conclusions of Law # 12 at 4–5. The GPO contemplates that at the end of five years, eighty percent of production will be accomplished through the "cold type" process in the Electronic Photocomposition Division and twenty percent will be completed by the "hot metal" process in the Composing Division. The GPO estimates that, because of these technological advances, it will have to reduce its Composing Division force of 1,400 to 300 at the end of five years.

## II. ASSESSMENT OF INDIVIDUAL CLAIMS.

### A. *Legal Standard.*

■ The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), articulated a four-element test that may be used to establish a *prima facie* case for a disparate treatment claim under Title VII. Under this test, a plaintiff must show:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). Satisfaction of the *McDonnell Douglas* test is one way of carrying the burden of showing acts by the employer from which one can infer, if a nondiscriminatory explanation is not offered, that it is more likely than not that the employer's actions were discriminatory. *See Furnco Construction Corp. v. Waters*, —— U.S. ——, ——, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). However, the *McDonnell Douglas* Court expressly recognized that compliance with the *McDonnell Douglas* test is not the exclusive means of establishing a *prima facie* case under Title VII. 411 U.S. at 802 n.13, 93 S.Ct. 1817.

■ If a plaintiff establishes a *prima facie* case under the *McDonnell Douglas* test or otherwise, the burden shifts to the employer to prove that "he based his employment decision on a legitimate consideration, and not an illegitimate one such as race."

*Furnco Construction Corp. v. Waters, supra,* —— U.S. at ——, 98 S.Ct. at 2950. As the Court in *McDonnell Douglas, supra,* 411 U.S. at 804, 93 S.Ct. 1817, noted and recently reaffirmed in *Furnco Construction Corp. v. Waters, supra,* —— U.S. at ——, 98 S.Ct. 2943, proof of such a justification does not necessarily end the inquiry. The plaintiff must be given the opportunity to demonstrate that the legitimate, nondiscriminatory motive proffered by the employer is merely a pretext for discrimination.

### B. *Plaintiff MacRae.*

Plaintiff James Robert MacRae is presently a black journeyman printer-proofreader in the Composing Division of the GPO. Mr. MacRae has worked in the Composing Division of the GPO since 1957, when he was originally hired by the GPO as a journeyman. During his tenure in the Composing Division, Mr. MacRae received six achievement awards. Plaintiff also received top security clearance, which permitted him to proofread top secret security documents.

In 1971, plaintiff applied for the position of Head Printer-Proofreader, an uprate position in the Composing Division. The promotion panel, in considering Mr. MacRae's application, utilized a supervisory evaluation prepared by Charles Killens, who was black. The panel rated Mr. MacRae among the five best qualified for the position at that time. However, Max Solomon, a white employee, received the position. Because he was not selected for this position, plaintiff filed an EEO grievance but did not pursue the case.

In September, 1973, plaintiff MacRae applied for the position of Assistant Foreman of the Main Proofroom. His supervisory evaluation was prepared by his supervisor, Henry Henson. Mr. Henson, who is white, was Foreman of the Main Proof Section. Mr. MacRae did not receive the job. However, plaintiff did not file an EEO grievance either on the basis of his evaluation or the failure to be selected for this position.

Mr. MacRae again applied for the position of Head Printer-Proofreader in April, 1974. The promotion panel utilized the supervisory evaluation prepared by Henry Henson in September, 1973. The promotion panel did not rate MacRae among the five best qualified for the position. John Ontko, a white employee, was selected for the position. MacRae filed an EEO grievance, because he was not selected for the position.

■ Plaintiff MacRae's complaint based on the denial of his 1974 application for the position of Head Printer-Proofreader is the only claim for relief before the Court.[1] In support of this claim, plaintiff asserts that Mr. Henson gave him an unfairly low evaluation because of his race and that this low evaluation was the major reason for his failure to be promoted to the position of Head Printer-Proofreader. He refers the Court to the fact that the evaluation prepared by Mr. Killens in 1971 was more favorable than Mr. Henson's evaluation. According to plaintiff, Mr. Henson, plaintiff's supervisor-foreman for a period of 2½ years, did not have an adequate opportunity to observe his work: Mr. MacRae spent eighty percent of his time in the security proofroom, whereas Mr. Henson came into the security room very infrequently. Plaintiff also contends that Mr. Henson did not observe his work during the four months he was on detail with the Armed Services Committee. Plaintiff further contends that his score on the supervisory evaluation was lowered, because he engaged in EEO counseling. Finally, plaintiff claims that Mr. Henson consistently rated blacks lower than whites on supervisory evaluations.[2]

Plaintiff MacRae appears to rely on the four-element *McDonnell Douglas* test to establish his claim of discrimination. How-

---

**1.** Although plaintiff is barred from seeking relief on earlier claims that he did not challenge administratively, these actions of the GPO may be probative of the claim now before the Court. *See United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

**2.** Plaintiff's claim is entirely based on the argument that his application was evaluated unfairly. He does not dispute that John Ontko, who was selected for the job, was qualified.

ever, the *McDonnell Douglas* test is not fully apposite, since the gist of plaintiff's complaint is that he was not considered qualified for the position of Head Printer-Proofreader because of a discriminatory evaluation. The Court therefore has considered the totality of the evidence offered by plaintiff to determine whether an inference of discrimination has been raised.

Before analyzing plaintiff MacRae's case, the Court will briefly review the procedure employed by the GPO in selecting candidates for uprate and supervisory positions. The selection process essentially involves three steps. First, all applications that do not meet the basic Civil Service Commission (CSC) requirements for a particular position are filtered out. Second, a three-member promotion panel evaluates all the remaining applications.[3] The promotion panel is comprised of an EEO representative (a former journeyman), a person knowledgeable in the work area of the vacancy, and a disinterested party. The promotion panel is required to select the five best qualified candidates and certify them to the selecting official. Although the panel numerically ranks the applicants in order to determine the top five candidates, it must present the five candidates in alphabetical order to the selecting official. The third step is the selecting official's recommendation of a candidate.

In determining the five most qualified candidates, the promotion panel may consider the supervisory evaluation, relevant test scores, achievement awards, leave record, prior, outside, or internal training experience, and the job criteria specifically listed in the position announcement by the placement specialist. The panel and a placement specialist must establish the factors that will be utilized to evaluate the candidates for the particular vacancy and the weight to be assigned to each of the factors. The panel is required to use the same rating scheme for each application for a given vacancy and also must not weight one factor more than three times that of another factor. Specific written guidelines further restrict the panel: The panel may not assign more than eighty-five points to a supervisory evaluation, twenty points to a "potential" rating, fifteen points to awards, ten points to outside training or activities, and fifty points to specialized experience or knowledge.

The supervisory evaluation is generally a very important factor. An employee applying for a supervisory position will be rated on seventeen factors, while only eight rating factors are filled out on the evaluation form if the position sought is nonsupervisory or noncraft. Rating factors specifically provided for on the evaluation form include quality, quantity, job or trade knowledge, ability to learn, dependability, and industry and attendance. The evaluation form also provides space for comments on the employee's potential, awards, outside training, employee's comments, attendance, and use of leave.

In analyzing plaintiff MacRae's claim of discrimination, the Court will first examine his assertion that he received an unfairly low evaluation and that this was a result of race discrimination. Plaintiff's claim to the contrary notwithstanding, the Court finds that Mr. Henson had ample opportunity to observe Mr. MacRae's work, even though Mr. Henson did not spend the majority of his time in the security room where Mr. MacRae worked most of the time. Mr. Henson was his supervisor for a period of approximately two and a half years. Mr. Henson was given security clearance on February, 1972, nineteen months prior to his evaluation of Mr. MacRae.[4]

---

3. However, if there are less than five candidates for a vacancy, the second step is bypassed and all applications are sent immediately to the selecting official.

4. The Court notes that Mr. Henson's opportunity to observe Mr. MacRae's work appears much greater than that of Charles Killens, a former supervisor, who Mr. MacRae claims rated him fairly. Mr. Killens rated Mr. MacRae after only ten weeks of supervision. Mr. Killens never entered the security room where Mr. MacRae worked most of the time. Finally, Mr. Killens was also ill for a long period of time.

The Court finds no credible evidence that Mr. Henson gave Mr. MacRae an unfairly or arbitrarily low rating. Mr. Henson's evaluation (highest rating on seven factors, second highest on ten factors, and a maximum score on potential) is not inconsistent with the evidence. A number of witnesses consistently testified that Mr. MacRae was a slow, methodical, average worker. *See, e. g.*, Tr. 269, 556–57, 606–08, 630–32. Max Solomon, who prepared a favorable supplemental evaluation, rated Mr. MacRae superior on three factors but "above average" on ability to "meet deadline dates under continuous pressure." Exh. 72.[5]

There appears to be nothing irregular about Mr. Henson's use of the September, 1973 supervisory evaluation he prepared for Mr. MacRae's application for the position of Head Printer-Proofreader in 1974. The GPO's policy was to utilize a supervisory evaluation for a period of a year.

The Court is also unpersuaded by the statistics offered by plaintiffs to show that Mr. Henson consistently rated blacks lower than whites. The statistics were based on sixteen white employees and six black employees. The Court finds the small statistical disparity insignificant in light of the small sampling and lack of any other evidence of discrimination.

Neither the evaluation by Mr. Henson nor the rating by the promotion panel reveals that vague and subjective criteria were used in order to discriminate against plaintiff MacRae. Both the supervisor and the promotion panel must follow written guidelines in performing their functions in the selection process. The selection system, with its written standards and safeguards, is readily distinguishable from those systems disapproved in the cases cited by

plaintiff. *See, e. g., Rowe v. General Motors Corp.*, 457 F.2d 348, 358 (5th Cir. 1972). In the instant case, the rating for potential would appear to be the most susceptible to subjective application; however, Mr. MacRae received the *maximum* score in this category.

There is no evidence of discrimination in the promotion panel's evaluation of plaintiff's application. Plaintiff was rated on the basis of the same four factors as all other applicants for the position of Head Printer-Proofreader: the supervisory evaluation; the supplemental evaluation; potential; and awards. Plaintiff received maximum scores on the latter two factors. Plaintiff was ranked sixth,[6] and, therefore, under established Civil Service procedures, his name was not submitted to the selecting official for consideration.

█ In conclusion, the Court finds no direct evidence of discrimination. Moreover, the Court finds no evidence of disparate treatment upon which to base an inference of discrimination. Accordingly, the Court concludes that plaintiff has failed to establish a *prima facie* case of discrimination. Indeed, defendant has proved by a preponderance of the evidence that discrimination was not a factor in plaintiff MacRae's evaluation and nonselection for the position of Head Printer-Proofreader.

### C. *Plaintiff Hamilton.*

Plaintiff Jesse Hamilton has been employed in the Composing Division as a linotype operator since 1961. He has worked mainly on the 11:30 P.M. to 8:00 A.M. night shift.

In July, 1973, plaintiff Hamilton requested training as head copy cutter,[7] head desk man, and any other training that would

---

**5.** The Court also finds no credible evidence to support plaintiff's allegation that Mr. Henson gave him a lower rating because he engaged in EEO counseling.

**6.** The Court rejects plaintiff's conclusion that, since he was rated among the five most qualified candidates for the same position in 1971 and his work had not deteriorated since then, he should have been rated among the top five in 1974. Plaintiff's argument ignores the prob-

able impact of outside factors, such as the different relative qualifications of competitors for the position in 1974.

**7.** Copy cutting refers to the process of cutting the raw copy in order to enable the linotype operators to set it on their machines. *See* Defendant's Proposed Findings of Fact and Conclusions of Law # 60 at 21.

lead to an uprate position. Although his supervisor responded that he would receive training along with the others, he never received training.[8] Because he was denied the training he requested, Mr. Hamilton filed an EEO complaint.

Plaintiff Hamilton contends that training is essential in order to obtain a promotion and that if he had received the training he sought, he would have been more qualified for higher lever positions. He argues that the denial of training effectively limited any possibility of promotion. Plaintiff argues that, contrary to the GPO's representation, it was practically impossible to provide copy training on the late night shift; moreover, if it were not possible, plaintiff could have been detailed to an earlier shift for training. Plaintiff also claims that he was given an unfairly low score on his supervisory evaluation and this was a significant factor in his failure to be selected for the supervisory development course.[9]

█ The Court finds no evidence whatsoever that plaintiff Hamilton's failure to receive training was a result of race discrimination. The overwhelming weight of the evidence supports the GPO's contention that it would severely impair productivity and efficiency if copy cutting training was provided on the late night shift. The bulk of the Congressional copy comes in around 6:00 P.M.; accordingly, the copy cutting training is generally conducted on the 6:00 and 7:00 P.M. shifts. Copy cutting training on the 11:30 shift would be difficult, since copy cutting is usually completed or almost completed at that time. Copy cutting training could slow up production and jeopardize meeting the 6:00 A.M. production deadline for the Congressional Record.

The GPO contends, and the plaintiff does not refute, that no individual, either white or black, working on the 11:30 night shift

has been given copy cutting training. Indeed, Mr. Hamilton was told that if he wanted an opportunity to receive copy cutting training, he should transfer to an earlier shift. However, he did not file an application to transfer shifts, because of his belief that transfer would not guarantee that he would be given training. In 1975, when the GPO asked employees to indicate their preferred shift, Mr. Hamilton specified the 11:30 night shift.[10]

Plaintiff contends that he could have been detailed to an earlier shift to receive training. However, the Court finds that the failure to detail plaintiff to an earlier shift for training is not evidence of discrimination. Neither white nor black employees have ever been detailed to an earlier shift for copy cutting training. Moreover, as the Supreme Court recently observed:

> Title VII forbids [an employer] from having as a goal a work force selected by any prescribed discriminatory practice, but it does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees. To dispel the adverse inference from a prima facie showing under *McDonnell Douglas*, the employer need only "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas, supra*, at 802, 93 S.Ct. at 1824.

*Furnco Construction Corp. v. Waters, supra*, ── U.S. at ──, 98 S.Ct. 2943.

The Court also finds that Mr. Hamilton's failure to receive training for the position of head desk man was not due to racial discrimination. Harold Danburg, Foreman of the Night Linotype Section, abolished the position of head desk man. The only other uprated position for which Mr. Hamilton could conceivably receive training on the 11:30 night shift was maker-up-in-charge. However, compositors rather than linotype operators usually train for this job.

8. Plaintiff Hamilton claims that his earlier requests for training were either denied or ignored.

9. The supervisory development program, also known as GPO–1, provides training for supervisory craft positions. Completion of the GPO–1

course is a factor considered in evaluating applicants for supervisory positions.

10. The Court notes that the 11:30 night shift may be preferable for some journeymen, since they receive 15 percent above the normal hourly rate for journeymen.

Finally, the Court rejects plaintiff's claim that he was rated unfairly on his supervisory evaluation and this was a significant reason for the denial of his application for the 1973–1974 supervisory development course. There is no evidence that Mr. Hamilton's supervisor, Joseph Mebane, who is black, discriminated against Mr. Hamilton in filling out his supervisory evaluation. Plaintiff's premise that Mr. Mebane's alleged discriminatory evaluation was directed by his superior, Harold Danburg, is wholly unsubstantiated.

The Court finds that plaintiff was not selected for the supervisory development program, because his written test score (32 out of 50 correct) was too low. Candidates for the program are ranked on the basis of the supervisory evaluation and a written test developed by the Civil Service Commission. Thus, even if plaintiff had received a perfect score on his supervisory evaluation, he would not have been selected to participate in the training program.

The Court finds no discrimination with respect to Mr. Hamilton's application for the supervisory development course. Indeed, two of the three candidates selected to participate in the 1973–74 course were black.

The Court therefore concludes that plaintiff Hamilton has failed to prove by a preponderance of the evidence that he was denied copy cutting or any other training or admission into the supervisory development course because of race discrimination. Accordingly, the Court grants judgment for the defendant on this claim.

### D. Plaintiff Carter.

Plaintiff Bruce Carter was first employed by the GPO in November, 1966 as a printing plant worker. He began an apprenticeship program at the GPO in 1968, and upon completion of the course in 1972, he became a journeyman. Since 1972, he has been employed as a journeyman in the Job Section of the Composing Division.

In February, 1974, plaintiff began training in imposition.[11] At the time Mr. Carter arrived, Richard McElroy, who is white, was training in imposition in fulfillment of the intensive training requirement for the apprenticeship program. The two men were trained by the imposer in charge, John McAuliffe, who is white. In February, 1975, Richard McElroy completed his apprenticeship course and thus began to work as a journeyman. Several months later, plaintiff McElroy was selected to work in imposition, and Mr. Carter was transferred to do "floor" work[12] in the Job Section of the Composing Division.

Plaintiff Carter claims that Mr. McElroy received more extensive training and greater supervision than he did and that this unequal training was due to race discrimination. Central to plaintiff's claim is the premise that imposition is considered one of the most desirable jobs within the Job Section, because imposition experience provides an employee with a broader knowledge of the printing process and is a valuable credential for promotion purposes. Thus, as evidence of racial discrimination, plaintiff cites that his training opportunity in imposition was unequal to that of Mr. McElroy; Mr. McElroy was transferred to imposition and Mr. Carter was transferred out of imposition, even though Mr. Carter had greater seniority; and no blacks had received training in imposition prior to the time Mr. Carter was trained. Plaintiff Carter contends that, as a result of such discriminatory treatment, he is less likely to be selected for cross-training or job promotions than if he had received adequate training in imposition.

■ The Court finds no credible evidence to support plaintiff Carter's claim that he

---

11. Imposition involves the laying out of pages in a press form in order that the pages will be in the proper sequence after the printed sheet has been folded. See Exhibit A, Defendant's Proposed Findings of Fact and Conclusions of Law.

12. "Floor" work refers to work, such as setting type by hand, setting bold type, and making type into page and galley, performed at various sites on the job room "floor." See Defendant's Proposed Findings of Fact and Conclusions of Law # 76 at 26.

was discriminated against because he did not receive an equal training opportunity in imposition. The evidence does not reveal that imposition is uniformly considered one of the most desirable jobs within the Job Section. Indeed, some employees prefer "floor" to imposition work, since the latter is heavier and dirtier. *See, e. g.*, Tr. 735–36. Thus, the selection of Mr. McElroy to work in imposition and the transfer of Mr. Carter to a "floor" job is not probative of discriminatory treatment.[13]

The evidence also does not support the contention that the alleged "diminished training" that Mr. Carter received resulted from race discrimination. At the time that Carter was assigned to imposition for training, Mr. McElroy had been training for three months in imposition as part of the eighteen-month intensive training required for completion of the apprenticeship program.[14] Thus, it is logical that, in the early stages of Mr. Carter's training, Mr. McElroy would be more proficient and would perform some of the more difficult jobs. According to John McAuliffe, the primary mode of training was self-training. After he taught the basic skills, he would indicate to the trainee that he would be available during working hours for questions. Once Mr. Carter acquired the basic skills, Mr. McAuliffe left the work files out, so that Mr. McElroy and Mr. Carter could choose their own work. The Court does not find evidence sufficient to establish that Mr. Carter's training was not equal to that of Mr. McElroy. Even if the evidence did establish that Mr. Carter was given less training and supervision than Mr. McElroy, no evidence was introduced to demonstrate that the differential treatment was motivated by racial considerations.

The Court concludes that plaintiff failed to prove that he was denied an equal opportunity for training in imposition. Accordingly, plaintiff has not established a *prima facie* case of discrimination under the *McDonnell Douglas* or any other standard.

## III. ASSESSMENT OF THE CLASS CLAIM.

Plaintiffs essentially rely on three types of evidence to support their class claim. First, plaintiffs claim that individual instances of discrimination support the class claim. Second, plaintiffs utilize several sets of statistics. Third, plaintiffs allege that the GPO employs subjective and vague factors in the selection process which has permitted discriminatory application.

The Court has already determined that the named individual plaintiffs have failed to establish a *prima facie* case. The only class members, other than the named plaintiffs, who testified as to discrimination against themselves in support of the class claim were Charles Sims, Reginald Williams, and Edwin Campbell. However, the nature of these allegations does not warrant a lengthy analysis. None of these witnesses submitted any evidence that they were being treated differently than white or any other employees similarly situated. Thus, the Court concludes that the individual claims of discrimination do not provide support for the class claim.

The Court will now evaluate the statistical evidence presented. As the Supreme Court in *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977), reaffirmed, "gross statistical disparities . . . alone may in a proper case constitute *prima facie* proof of a pattern or practice of discrimination." In order to establish a *prima facie* case of discrimination in disparate treatment and pattern-and-practice cases, the statistics must compare the percentage of minority workers in the employer's work force with the percentage of qualified mem-

---

**13.** This conclusion is further supported by the testimony that Mr. Carter received a higher rating on "floor" work than did Mr. McElroy.

**14.** In contrast, Mr. Carter was not assigned to imposition as part of an intensive training program. Mr. Carter had received intensive train-

ing in a different area. Although no longer in a training status, Mr. Carter could be assigned for training within the Job Section, if his supervisor determined that production demands permitted it.

bers of the minority in the relevant labor market. *See, e. g., Hazelwood School District v. United States, supra,* 433 U.S. at 308, 97 S.Ct. 2736. Thus, to establish a *prima facie* case of discrimination in the instant case, the statistics should compare the percentage of blacks in uprate and supervisory positions with the percentage of black journeymen employed by the GPO who are qualified for uprate or supervisory positions.

█ Plaintiffs have presented statistics indicating the percentage of white and blacks employed in subjourneyman, journeyman, uprate, and supervisory positions in the Composing Division for the years 1974, 1976, and 1977. However, plaintiff failed to present any evidence to indicate the percentage of black journeymen that would have been qualified for promotion. Plaintiffs cannot establish a *prima facie* case of discrimination by merely setting forth the racial composition of the various levels of employment in the Composing Division; there must be some evidence concerning the pool of journeymen qualified for uprate or supervisory positions. *See Pack v. ERDA,* 566 F.2d 1111, 1113 (9th Cir. 1977). Thus, these statistics are not probative of plaintiffs' claim that qualified lower level journeymen employees have been unfairly denied promotions to uprate and supervisory positions.

The Court finds that the other statistical evidence offered by plaintiffs does not support plaintiffs' class claim. Plaintiff submitted charts listing the individual supervisory evaluations for 1973–74 and 1975–76. Exhs. 18, 19. The average score of minorities and nonminorities were computed on the basis of these figures. However, the figures do not reflect the true average, because Mr. Drewery, in preparing these figures, used an incorrect arithmetic procedure. He combined scores from two types of evaluations with different maximum scores (short evaluations with 8 rating factors for nonsupervisory and nonprinting specialist positions and long evaluations with 17 rating factors for supervisory posi-

tions), without any indication of the number of short evaluation or long evaluation scores. Because of the indiscriminate combination of scores, the averages obtained from the data are invalid.[15]

While the charts prepared by Mr. Drewery comparing supervisory evaluations on a factor-by-factor basis for 1973–74 and 1975–76 are not flawed because of the use of an improper arithmetic procedure (*see* Exhs. 17B, 17C), the Court finds these figures to be of little probative value. Plaintiffs failed to introduce any evidence bearing on the statistical significance of the disparity between the average score for minorities and nonminorities on the individual rating factors.

Plaintiffs also introduced into evidence a list of minority Composing Division employees whose applications for training filed in 1976 and 1977 were denied. *See* Exh. 26. This list by itself is of no probative value. Statistics indicating the nonminorities whose applications for training filed in 1976 and 1977 were denied as well as the minorities and nonminorities who filed applications during this period and received training would be necessary in order to draw an inference of disparity of treatment.

Finally, plaintiffs introduced evidence that, during the period from April, 1973 to November, 1974, all twenty-six vacancies for supervisory positions were filled by nonminorities. Of the 103 candidates that were qualified for these positions, twelve were minorities. During the period from October, 1975 to January, 1977, five of the nineteen vacancies for supervisory positions were filled by minorities. Fifty-three of the 174 candidates qualified for these positions were minorities. The statistics for the first period, if viewed in isolation, are somewhat troubling. However, when viewed in context of all the evidence of record and the statistics for the second period (which indicate that twenty-six percent of the supervisory positions were filled by blacks), these figures are insignificant.

**15.** Exhibits 75 and 76, which are based on the same statistics, are similarly flawed.

█ Thus, the Court concludes that the statistics offered by plaintiffs were either incomplete, failed to make a comparison of the relevant categories, or were arithmetically incorrect. Thus, plaintiffs have failed to establish a *prima facie* case on the basis of statistical evidence.[16]

█ Finally, plaintiffs contend that the vague and subjective factors utilized by the GPO in the selection process were susceptible to discriminatory application. As the Court indicated in its discussion of plaintiff MacRae's claim, the selection processes found objectionable in the cases cited by plaintiffs suffered from infirmities of a wholly different magnitude than does the GPO's selection process.[17] For example, in *Rowe v. General Motors Corp.*, 457 F.2d 348, 358–59 (5th Cir. 1972), vague and subjective criteria and four other factors coupled with statistical evidence established a *prima facie* case of discrimination.[18]

In contrast, the GPO, pursuant to Civil Service Commission rules, follows the Federal Merit Promotion Program. Since 1971, all vacancies for uprate, supervisory, and noncraft monotype casterman positions have been advertised as required by the applicable promotion plans. In 1973, the GPO also decided to post vacancies for the positions of supervisors of PPWs, monotype castermen uprates, and monotype machinist trainees.

The selection of a candidate for a supervisory position is a three-step process involving the participation of a placement specialist, promotion panel, and selecting official. No single factor or person controls the selection process. The practice of the promotion panel is to avoid personal contact with the supervisor of the applicant or the supervisor of the section with the vacancy; rather, panel members obtain information from the papers submitted to them or from the placement specialist. Both the supervisor who prepares the evaluation and the promotion panel must follow written guidelines that set forth factors upon which the candidate is to be evaluated. These criteria are sufficiently specific and related to job performance. A degree of subjectivity is inherent in all evaluation criteria; however, the subjectivity in the supervisory evaluation criteria in the instant case has not resulted in discrimination.

The Court concludes that the selection process standards in the instant case are not vague and subjective or applied in a discriminatory manner in violation of Title VII. On the contrary, there are procedural safeguards built into the selection process.

█ Moreover, even if the Court were to conclude that the selection process was tainted by vague and subjective factors that would readily permit discriminatory application, this finding alone would be insufficient to establish a *prima facie* case. These factors must be presented in conjunction with proper statistical evidence or other evidence of discriminatory effect. *See Muller v. United States Steel Corp.*, 509 F.2d 923, 928 (10th Cir. 1975).

---

**16.** The Court recognizes that this statistical evidence *may* be probative in an individual case, *see Senter v. General Motors Corp.*, 532 F.2d 511, 528 (6th Cir. 1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1977), as well as in a class action. However, in view of the insignificance of plaintiffs' statistics with respect to their class claim, these statistics fail to buttress plaintiffs' individual claims.

**17.** For an overview of the GPO's selection procedures, see section IIB.

**18.** The following factors were cited by the *Rowe* court:

(i) The foreman's recommendation is the indispensable single most important in the promotion process.

(ii) Foremen are given no written instructions pertaining to the qualifications necessary for promotion. (They are given nothing in writing telling them what to look for in making their recommendations.)

(iii) Those standards which were determined to be controlling are vague and subjective.

(iv) Hourly employees are not notified of promotion opportunities nor are they notified of the qualifications necessary to get jobs.

(v) There are no safeguards in the procedure designed to avert discriminatory practices.

457 F.2d at 358–59.

The evidence of individual claims of discrimination, statistics, and vague and subjective criteria, when considered alone or together, fails to establish a *prima facie* case of discrimination against the certified class. Accordingly, the Court will grant judgment for the defendant on the class discrimination claim.

## IV. CONCLUSION.

The Court concludes that plaintiffs have failed to establish a *prima facie* case of racial discrimination on either the individual or class claims. Accordingly, the Court will enter judgment for the defendant on all claims before the Court.