Ronald E. BAILEY, et al., Plaintiffs,

v.

Michael DiMARIO, Public Printer of
the United States, Defendant.

Civil Action No. 91–2074 (HHG).

United States District Court,
District of Columbia.

April 28, 1995.

Frederic W. Schwartz, Jr., Washington, D.C., for Plaintiffs.

Bruce R. Hegyi, Assistant U.S. Attorney, Washington, D.C., for Defendant.

Mary K. O'Melveny, Washington, D.C., for Non–Aligned Party Columbia Typographical Union.

## OPINION

HAROLD H. GREENE, District Judge.

### Findings of Fact

This action was commenced on August 16, 1991 by seventeen individual plaintiffs employed by the United States Government Printing Office ("GPO"). At the time the complaint was filed, the plaintiffs were all employed by GPO as Video Keyboard Operators in the Video Keyboard Section ("VKS") of the Electronic Photocomposition Division ("EPD").

At the time the complaint was filed, the original defendant, Robert W. Houk, was the Public Printer at GPO, the agency's chief executive officer. At the time of trial, the present defendant, Michael F. DiMario, the Deputy Public Printer, was substituted as the name defendant by operation of Fed. R.Civ.P. 25(d). On November 23, 1993, Mr. DiMario became the Public Printer. By the time of trial, the claims of five defendants (Bailey, Boggins, Hawkins, Jordan, and Richardson) were dismissed.

By the time of trial, plaintiffs Bell, Bullock, Haygan, and Nelson were promoted to journeyman positions after graduating from apprentice training programs in 1971, 1972, and 1973. Plaintiffs Hill and Turner became journeymen in 1981 as a result of their selection for and completion of a two-year training program to retrain Monotype Castermen for the journeyman position of Monotype Keyboard Operator. This program was the result of a settlement agreement in a Title VII class action against GPO known as *Brewington, et al. v. Boyle*, C.A. No. 78–1290 (D.D.C.) (*"Brewington"*) and was agreed to by CTU. Plaintiffs Cave, Gay, Hill, Munford, Murriel, Rogers, Skipworth, and Turner formerly held the non-journeyman position of Monotype Casterman. They became journeymen at various times between October 16, 1983 and January, 1984 as a result of their selection for and completion of a two-year training program to retrain Monotype Castermen and other non-journeymen GPO employees for this journeyman position. Plaintiffs Cave, Gay, Hill, Munford, Murriel, Rogers, and Skipworth became Video Keyboard Operators upon their graduation from this program. Other than plaintiff Munford, none of the plaintiffs contend they suffered any economic harm as a result of purported discriminatory practices alleged in their complaint, and none seek monetary relief.

Plaintiff Munford was unable to meet the performance standards for the position of Video Keyboard Operator. In November, 1989, Mr. Munford accept reassignment to a semi-skilled position as Equipment Maintenance Worker and held that position at the time of trial. As a result of his reassignment, he earned forty cents per hour less than he had earned as a Video Keyboard Operator. Just before trial, plaintiff Munford asserted, for the first time, a claim for back pay and reinstatement related to his demotion for failure to meet the performance standards then in place for Video Keyboard Operators.

On November 1, 1989, plaintiff Munford executed a Settlement Agreement, under which he was given the right to choose freely between two settlement options. After he executed the Settlement Agreement, GPO paid to plaintiff Munford, and he accepted, all monies due to him under the agreement. In neither his Informal EEO Complaint nor his Formal EEO Complaint, nor in his Affidavit before the EEO Investigator, did plaintiff Munford ever indicate that he was seeking back pay in what became this action. At trial, plaintiffs' counsel conceded to the Court that plaintiff Munford was not identified in the Complaint as an individual plaintiff who was seeking back pay.

Plaintiffs were members of a class of GPO employees whose claims were prosecuted in a case known as *MacRae v. McCormick*, 458 F.Supp. 970 (D.D.C.) ("MacRae"). *MacRae* was prosecuted on behalf of

> All current black employees of the Composing Division of the Government Printing Office in the metropolitan Washington, D.C. area who have applied for and have been, subsequent to March 24, 1972, or are being denied promotions, training opportunities, or transfers because of defendant's allegedly discriminatory practices and policies.

Judgment in that case was entered for GPO "on all claims before the court." *MacRae v. McCormick*, 458 F.Supp. 970, 21 Fair Emp. Prac.Cas. 100, 102, 110 (D.D.C.1978), *aff'd sub nom.*, *MacRae v. Boyle*, No. 79–1753, 1989 WL 436444 (June 24, 1980).

Plaintiffs Cave, Gay, Hill, Munford, Murriel, Rogers, Skipworth and Turner were *Brewington* class action members and considered themselves plaintiffs; as did most of the plaintiffs herein. The class in *Brewington* consisted of all past and present black employees of the GPO who have been employed as monotype castermen and have had their opportunities affected by GPO practices and policies, or have been reprised against for attempting to exercise their Title VII rights. The *Brewington* case was settled on March 26, 1979 and "all allegations and claims against the GPO" were withdrawn "with prejudice." The "Settlement Agreement and General Release" was individually signed by all of the plaintiffs and class members, other than plaintiff Murriel. Prior to their settlement, counsel for the *Brewington* class informed the Monotype Castermen that they would be unable to "sue the Government Printing Office for the conditions that were the basis of the *Brewington* case."

The Columbia Typographical Union ("CTU") is a labor organization affiliated with the International Typographical Union ("ITU"). It is and has been throughout this litigation the collective bargaining representative for GPO employees holding journeyman printer positions. CTU was joined on May 21, 1993 as a non-aligned party in this case, in response to GPO's consent motion, pursuant to Fed.R.Civ.P. 19. Joinder was sought because "the central thrust of the complaint is a challenge to the use of a priority system as the means of assigning work on periodic bases to agency employees."

Except for a night-shift differential of 15%, all journeymen printers within the CTU bargaining unit receive the same rate of pay. The collective bargaining agreement between GPO and CTU provides for a selection system for journeymen employees seeking transfers between shifts or to fill lateral vacancies within shifts which is based upon "priority." This system is contained in Article VII of the Memorandum of Understanding ("MOU") which provides, *inter alia*, that volunteers for transfers will be selected according to their continuous priority as journeymen in the GPO, provided they can meet

the requirements for the position. The date than an employee became a journeyman at GPO is known as the journeyman "priority" date. The priority date reflects the date an individual commenced their job in EPD and does not reflect the number of years they may have been a journeyman printer working in another location or division at GPO, or for another employer. Article VII of the MOU (journeyman priority) applies to all initial appointments, reinstatements, assignments, reassignments or vacancies.

The term "hook work" refers to keyboarding work assignment involving mainly the inputting of raw data onto the system. There are hook work assignments on each of the three shifts within VKS. Priority is not and has never been related to hook work.

The title of "journeyman" is used throughout the world. It indicates that the individual has been thoroughly trained in the craft of printing. The journeyman priority concept in its present form was adopted by the CTU convention in 1896. A journeyman's "priority" is based upon the date that the journeyman printer began working at a particular location. Thus, when a journeyman leaves one location and moves to another, he does not carry the former priority date with him. Instead, he receives a new priority date at the new work site. The use of priority as a primary vehicle for making lateral shift and assignment decisions at GPO has been included in the parties' collective bargaining agreement in its present form since December, 1972.

Plaintiffs make no claim that the priority system was developed to intentionally discriminate against them. Historically, at GPO, an individual's priority date represented the date on which that employee achieved journeyman status at GPO, either by way first hire in the case of an individual who was already a journeyman printer, or the date an individual completed a formal GPO apprenticeship training program. This was changed in the late 1980's or early 1990's when the ITU amended its constitution to provide that an individual's journeyman priority date should begin with the date they began their apprenticeship training program, rather than the date they completed the pro-

gram. Insofar as CTU is a Local affiliated with the ITU, it subsequently amended its constitution and by-laws to conform to this change. This change was not retroactive, and affected only GPO employees who became journeymen after this change was adopted. If a GPO employee was already a journeyman at the time of this change, the employee, whether black or white, retained his or her original priority date. Plaintiffs were unaffected by this change, because their priority dates all precede this change in rules.

An individual may achieve "journeyman" status, and thus priority, at GPO either because he or she is already a journeyman at the time he or she is hired, or because he or she becomes a journeyman after being employed by GPO either through a formal apprenticeship or through an apprenticeship training program for the graphic arts. An individual can make a formal application for a position in a GPO apprenticeship program, in response to an official "job announcement." Job announcements, in the form of letters or personnel bulletins were posted at GPO as well as published nationwide.

Historically, selection for a position in the apprentice program at GPO has always been highly competitive. Traditionally applicants were required to pass a nationwide examination for apprenticeships in the graphic arts which was administered by the United States Civil Service Commission. This examination was open to "all interested persons regardless of race, religion, creed, sex or national origin." In addition to passing the examination with a minimum score of 70, applicants were required to obtain and submit formal supervisory recommendations. Successful candidates were ranked according to test scores and by supervisory recommendations and selected from a list beginning with the individual who ranked the highest and continuing seriatim down the list until the requisite number of positions were filled. An individual who was employed at GPO could be selected for one of several positions within the apprentice program that were set aside for GPO employees. These positions were competitive within GPO. The GPO employees seeking these positions were still re-

quired to take and pass the national examination and to submit the required application materials, including supervisory evaluations, in accordance with the official job announcement. All GPO employees who applied for these set aside apprentice positions were ranked based upon their test scores and upon rankings established by other factors such as supervisory recommendations. Based upon these factors, employees were rated "best qualified," "better qualified" and "qualified." An individual at GPO could also be selected for apprentice training. "Trainees" were selected as the result of their score on the examination and evaluations by their supervisors and were also ranked on a registry. As vacancies occurred, names were referred from the training registry in rank order beginning with the individual with the highest score. These lists contained as many as 200 names.

A rank order list would normally remain effective for a period of about one year. It was used until another examination was given for the position. Once a new examination was given, the old list was abolished. CTU plays no role in determining whether an individual is accepted in the GPO apprenticeship program, and has never done so. For many years, the content and structure of the GPO journeyman printer apprentice program was the subject of periodically negotiated agreements between GPO and CTU, and was incorporated in the MOU. During this period, CTU participated in the structure of the GPO apprenticeship training program, and CTU's members (who were journeymen printers) were instructors and advisors in the apprentice program.

The position of Monotype Casterman was a non-journeyman semi-skilled position in the Composing Room which involved operation of a monotype casting machine used to cast "hot metal" type. The Monotype Casterman position was never a journeyman position at GPO or in the printing industry in general. A Monotype Casterman was not trained in the full range of skills involved in the printing trade and was not able to perform any other position outside the Casting Room.

Non-journeyman positions such as the Monotype Casterman were always paid on a different salary scale at GPO that was less than the journeyman wage scale, but higher than many others non-craft jobs. After December, 1973, the GPO paid the Monotype Casterman according to a wage scale based upon 70% of the journeyman wage scale. Monotype Casterman were selected for these positions based upon their scores on a written examination.

The printing and graphic arts industry has changed substantially over the years, and the skills required to perform this craft have also undergone a sweeping change, as technology has revolutionized many aspects of the printing craft. Prior to the late 1970s and early 1980s, most printing was done using "hot type" or "hot metal," methods which have since been substantially phased out and replaced by electronic equipment known as "cold type." When the transition from "hot type" to "cold type" occurred, the job skills possessed by employees holding traditional journeyman positions as well as Monotype Casterman were not longer relevant or necessary at GPO's Composing Division. Primarily as a result of the transition from "hot type" to "cold type," GPO's Composing Division was replaced by the Electronic Photocomposition Division. Virtually every Composing Room employee was affected by the transitions and changes resulting from the new technology. At the time of trial, EPD employed only approximately 600 employees, while approximately 1,500 had been employed by the Composing Division when the transition began. The change in technology also meant that GPO did not hire anyone into EPD from the mid–1970s until 1987.

Although the changes from hot metal composition to electronic photocomposition meant that much of the work to be done and prior training received by journeyman and non-journeyman employees was or would soon become obsolete at GPO, none of the approximately 1,500 working in the Composing Room at the time of transition from "hot type" to "cold type" lost their jobs.

As a result of the March 22, 1979 settlement of the *Brewington* case, approved by the CTU, a two-year training program was established for 24 Monotype Castermen to become Monotype Keyboard Operators, a

journeyman position. To be selected for one of the 24 spots in the Monotype Keyboard Operator Training Program, a Casterman was required to (1) apply, (2) take a standard apprenticeship test administered and scored by GPO Personnel staff, and (3) obtain a supervisory evaluation. Applicants were ranked upon a score obtained by combining the test score, which counted for two thirds, and the supervisor's evaluation, which counted for one third. Eight employees were selected for the first class out of the top ranked twelve employees. The same procedure was followed to select eight employees from the rank ordered listing for each of the two subsequent classes. While all of the plaintiffs in this action, who were previously Monotype Castermen, were plaintiffs in *Brewington,* only plaintiffs Hill and Turner met the qualifications for selection for that training program.

On October 4, 1982, after a lengthy period of negotiations, CTU and GPO agreed on a training program, applicable to all of the remaining Monotype Castermen, that enabled them to obtain training to become journeymen employees at GPO in the Video Keyboard Section. This October 4, 1982 agreement, which was sometimes known as the Video Keyboard Training Agreement, provided training for all non-journeyman employees whose work was being eliminated as the result of the transition from "hot type" to electronic data processing. It amended a prior training agreement dated December 23, 1981. It provided that any employee serving as of October 1, 1982 in the sub-craft positions of Monotype Casterman, Saw Operator, Slide Bank Operator, Sorts Casterman, Matrix Keeper, Spool Deskman or Monotype Machinist was eligible for training for reassignment as a Photocomposition Keyboard Operator Trainee provided that an application was submitted by October 17, 1982. Employees who successfully completed the training program were to be "assigned to the EPD Keyboard Section in accordance with Article VII of the Memorandum of Understanding."

The journeyman priority system operates in the same manner on all three shifts within the EPD. The journeyman priority system operates in the same manner in the proof room as it does in VKS. The concept, role, and operation of the journeyman priority system is well known within the printing craft and among GPO employees.

At GPO, priority lists are maintained by CTU for each applicable shift in EPD. The priority lists have also been posted by CTU on large bulletin boards located in each Section within the Composing Room and/or EPD. Each EPD Section is also known as a "Chapel" within CTU, a term which dates back to the days when printing was done in a church setting. A new priority list is generated each time there is a change of personnel by way of filing an opening or transferring to a different shift. That list is posted on the Section bulletin board, replacing the earlier priority list. In addition to the posted priority lists, also posted on Section bulletin boards are all notices of job openings and job opportunities which may be claimed by use of journeyman priority. All "Notices of Vacancy(ies)" refer to Article VII of the MOU and state, *inter alia,* that "Vacancy(ies) will be filled by priority from volunteers." An individual who wishes to volunteer for ("claim") a job opening or shift assignment which has been posted on the Section bulletin board must file a written claim for the position within 72 hours of the time the Notice has been posted. An individual who wishes to claim a vacant position on any shift may also submit transfer forms to the Chair of the Chairman's Chapel. These forms, which are effective for 90 days, are considered in the event a transfer opportunity arises during that period in the same manner as if an employee had filed a written claim within the 72 hour period after posting. If an employee who has completed a transfer form has the highest priority date of those filing written claims, and the appropriate job qualifications, then he or she will receive the position. Transfer requests must be renewed at the end of 90 days.

In the event there are not enough volunteers to fill an opening on a shift, employees are drafted. Employees with the lowest priority in EPD are drafted first for the opening.

An employee who disagrees with the results of the job claiming process may pursue an appeal process. In this case, none of the plaintiffs ever filed a job claim for an opening at EPD that was subsequently filled by an employee with a lower priority date, and none of the plaintiffs has ever appealed the results of the job claiming process.

Overtime assignments tend to occur most frequently on the second shift and on the third shift. Substantial hook work is required to be done by those who undertake overtime assignments; ranging between 50% and 90% of the work to be done on overtime. In this case, all of the plaintiffs have chosen voluntarily to work overtime assignments, knowing it would involve substantial hook work. Priority plays no role in an employee's selection for an overtime assignment, unless there are not enough volunteers. Employees are almost never drafted for overtime assignments.

Plaintiffs were aware of the operation of the priority system when they came into EPD, whether as journeymen, journeyman apprentices, or journeyman trainees. Thus, they knew that there were other employees with higher priority dates who would have the priority to receive transfers or vacancies ahead of plaintiffs, if such co-employees filed competing claims for these positions. The plaintiffs who were formerly Monotype Castermen understood that they were settling all of the claims that had been raised in *Brewington*. The EPD shift and starting times for plaintiffs Cave, Gay, Hill, Munford, Murriel, Rogers, Skipworth, and Turner when they first entered EPD were determined by the application of the priority system.

Some plaintiffs currently employed in EPD could have exercised their priority to claim openings on the first or third shifts but instead chose to remain on the second shift. GPO announced posts for the Electronic Job Section at EPD in October, 1985. The formal announcement of these vacancies was posted on all Section Boards in December, 1985. In March, 1988, job claim results were posted for two positions as Job Composition Systems Operator Trainee on the VKS second shift. Plaintiffs Bell, Bullock, Haygan, and Nelson all had higher priority dates than the individuals selected for these openings but chose not to file a claim for these positions.

At one point in the mid–1980s, an employee had to take a test to qualify for a position in the Text Processing area. Individuals were selected by priority in the order of their test scores for positions in Text Processing during that period. However, in this case, no plaintiff (other than plaintiff Bullock, who passed the test and received the assignment) introduced evidence that he took or passed such a test. After the testing requirement for the Text Processing area was no longer applicable, the Text Processing Operator position required that the individual seeking the position have successfully completed a training program for the position. In June, 1988, plaintiff Haygan exercised his priority and claimed a position as a Text Processing Operator Trainee on the VKS first shift.

The Job Composition Systems Operator position required that the individual seeking the position have successfully completed a training program for that position. The Job Composition Systems Operator Trainee position required that the individual had successfully passed a Computer Aptitude Test, scoring 88 or higher. In addition, employees were required to complete "experience forms" requesting reassignment to the Job Section. In this case, plaintiffs introduced no evidence that they took or passed the Computer Aptitude Test with the requisite score. Moreover, plaintiffs Gay, Murriel, Munford, Skipworth, and Rogers conceded that they never completed the Job Section "experience forms" or requested reassignment to the Job Section.

In June, 1988, two job claim results were posted for two positions as Job Composition Systems Operator Trainee on the third shift. Plaintiffs Bell, Bullock, and Nelson all had higher priority dates than the individuals selected for these openings, but they did not file a claim for these positions.

In September, 1989, job claim results were posted for the position of Job Composition Systems Operator Trainee on the first shift. No special qualifications were listed for the position. Plaintiffs Bell, Bullock, Haygan,

Hill, Nelson, and Turner all had higher priority dates than the individuals selected for these openings, but they did not file a claim for these positions.

Plaintiffs Bell, Bullock, Haygan, Nelson, Hill and Turner all had sufficient priority to claim a position as Job Section Room Operator on the first shift, if they chose to do so.

By the time they filed their complaint in this case, all of the plaintiffs had sufficient priority to claim "off-hook" positions on the first shift, but none ever did so. "Details" to Capitol Hill occur on the first shift. Details, which are assignments within a shift, are not governed by the priority system. Plaintiffs could have requested a Capitol Hill detail if they had transferred to the first shift. However, none of the plaintiffs ever requested a Capitol Hill detail or complained about not getting one.

The priority system has been uniformly applied to all GPO employees in EPD since its inception. Before the priority system was used to determine shifts and lateral job openings, these decisions were made on a subjective basis which has been described as "winking and nodding."

Dr. Kevin Gilmartin, an expert, compared the treatment of black employees to the treatment of white employees in his analyses, excluding the few Hispanic employees in his data file. White employees are presumed not to suffer discrimination, and therefore white employees form a more appropriate comparison group than non-white employees.

Among the employees included in Dr. Gilmartin's analyses (i.e., white or black employees who had worked at least 500 production hours in a year on the Second Shift of the VKS), white employees had substantially more priority than black employees. In 1986 and 1987, there was seven to ten years difference in the mean priority between white and black employees. By 1990 and 1991, the difference in mean priority had decreased to two to seven years.

Among the employees included in Dr. Gilmartin's analyses, in 1986 and 1987, blacks spent a few percent more of their production time on the hook than did white employees. In 1988 through 1991, however, the plaintiffs had lower mean percent time on the hook than white employees. The differences in percent time on the hook is relatively small.

Continuing his analysis, Dr. Gilmartin next rank ordered the amounts of priority among the employees each year. He then performed regression analyses to predict the percent time on the hook as a function of rank priority and race. Assuring the accuracy of his methods, Dr. Gilmartin determined that "collinearity" between rank priority and race did not create a problem for any of the regression analyses.

The regression coefficient for rank priority was statistically significant for three of the six years in the direction of indicating that higher priority individuals spend slightly less time on the hook than lower priority individuals. The largest coefficient among the six years was equal to one-third of one percent less time on the hook for each additional rank priority. One third of one percent is equivalent to two fewer hours of work on the hook for an employee who worked 600 hours on the hook during a year.

The regression coefficient for race was statistically significant in only one of the six years, and that one significant coefficient indicated that black employees tended to spend a lower percent of time on the hook than similar white employees when controlling for priority. The coefficient for race that year was $-5.83$, indicating that blacks spent between five and six percent less time on the hook than similarly situated whites.

Dr. Gilmartin concluded that, if one assumes that hook work is less pleasant than other tasks (and the Court notes that there is evidence that not all employees agree with this assumption), then to the extent that blacks are treated differently from whites of equal priority, blacks appear to be advantaged, rather than disadvantaged.

Dr. Gilmartin then analyzed the percent of production hours that each of the individual plaintiffs spent on the hook in each of the years from 1986 through 1991, when they worked at least 500 production hours on the second shift in the VKS. The plaintiffs' actual percent time on the hook was compared with the expected time on the hook based on

work assignments given to white employees in that year.

In the first analysis of the individual plaintiffs, the expected time on the hook for each plaintiff took into account the person's priority rank that year. The analysis showed that plaintiffs often spent a lower percentage of production time on the hook than would be expected based on the assignments given to similarly situated white employees. Of the twelve plaintiffs, one spent less time than expected on the hook in a majority of the years he was in the work force, and three spent less time than expected on the hook in every year. None of the disparities between actual and expected percent time on the hook was statistically significant.

In the second analysis of the individual plaintiffs, the expected percent time on the hook for each person ignored the person's priority rank that year. The expected percent time on the hook was merely the mean percent time for the white employees that year. Again, plaintiffs often spent a lower proportion of production time on the hook than would be expected based on the assignments given to white employees. Of the twelve plaintiffs, two spent less time than expected on the hook in a majority of years they were in the work force, and two spent less time than expected on the hook every year. None of the disparities between actual and expected percent time on the hook was statistically significant.

Dr. Gilmartin concluded from these analyses that he had found no evidence of plaintiffs being assigned a statistically higher proportion of hook work than similarly situated white employees; regardless of whether one takes into account or ignores priority.

The Court finds that the analysis performed by Dr. Gantz, the statistical expert offered by plaintiffs, was unpersuasive.

Blacks have been employed in journeyman positions at GPO in the Composing Room dating back for many years prior to the passage of Title VII of the Civil Rights Act of 1964 or the adoption of Article VII of the MOU between GPO and CTU.

In 1961, approximately 26% of the members of the GPO apprentice graduating class were black. This percentage is approximately two-and-a-half times greater than the percentage of blacks in the relevant labor market during that period. The class began in 1956. It was the first apprentice class appointed since 1952 and was limited to "permanent" employees of GPO "regardless of age or position." Seven hundred (700) applicants competed for 50 positions. The applicants took examinations and were interviewed by a selection committee. The applicants' work records, test scores, and interview results were used to select the successful candidates.

In 1963, approximately 42% of the members of the GPO apprentice graduating class were black. This class began in 1958. This percentage is more than four times greater than the percentage of blacks in the relevant labor market during that period. Thousands took the national examination for this apprentice class. Seventy-five individuals from ten states and the District of Columbia were selected.

Among the senior journeymen employed at GPO in 1963, approximately 24% were black.

In 1969, approximately 28% of the members of the GPO apprentice graduating class were black. This class began in 1964. This percentage is more than two-and-a-half times greater than the percentage of blacks in the relevant labor market during that period. Thousands took the competitive national examination for this apprentice class. Eighty-eight individuals were selected from 14 states and the District of Columbia.

In 1970, approximately 25% of journeymen employees or apprentices working in the Composing Room were black. This percentage is more than two times greater than the percentage of blacks in the relevant labor market during that period. Approximately 50% of the 1970 apprentice class members were black. This percentage is more than two times greater than the percentage of blacks in the relevant labor market during that period. Approximately 50% of the 1970 apprentice class members were black. This percentage is more than five times greater than the percentage of blacks in the relevant labor market during that period.

### Conclusions of Law

#### I

■ Under the related doctrines of res judicata and collateral estoppel, a final judgment on the merits of an action precludes the parties from relitigating issues that were or could have been finally decided; and once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first action. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980); *United States v. Mendoza*, 464 U.S. 154, 159, 104 S.Ct. 568, 571–72, 78 L.Ed.2d 379 (1984); *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *American Employers Insurance Company v. American Security Bank*, 747 F.2d 1493, 1498 (D.C.Cir.1984); *I.A.M. National Pension Fund v. Industrial Gear Manufacturing Company*, 723 F.2d 944, 947 (D.C.Cir.1983).

■ Application of the doctrine of collateral estoppel "represents a decision that the needs of judicial finality and efficiency outweigh the possible gains of fairness or accuracy from continued litigation that previously has been considered by a competent tribunal." *Nasem v. Brown*, 595 F.2d 801, 806 (D.C.Cir.1979). Application of the doctrine thereby serves to relieve the parties of the expense, vexation, and burdens attending multiple lawsuits; conserves judicial resources; minimizes the risk of forum shopping, piecemeal litigation, and inconsistent decisions; and provides finality in the resolution of disputes. *Mendoza*, 464 U.S. at 159, 104 S.Ct. at 571–72; *Montana*, 440 U.S. at 153–54, 99 S.Ct. at 973–74; *see Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C.Cir. 1981).

■ Under the doctrine, "the parties to a suit and their privies are bound by a final judgment and may not relitigate any ground for relief which they have already had an opportunity to litigate—even if they chose not to exploit that opportunity—whether the initial judgment was erroneous or not." *Hardison*, 655 F.2d at 1288; *accord Montana*, 440 U.S. at 153, 99 S.Ct. at 973; 1B J.

Moore, *Moore's Federal Practice* ¶ 0.405; Restatement (Second) of Judgments § 47. "Preclusion cannot be avoided simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first." *Yamaha Corp. of America v. United States*, 961 F.2d 245, 254–55 (D.C.Cir.1992), *cert. denied*, 507 U.S. 980, 113 S.Ct. 1436, 122 L.Ed.2d 802 (1993). *See also*, C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*: Jurisdiction § 4426 at 141 (1981).

■ Once a particular issue has been raised, it is the entire issue that is precluded, not just the argument raised in support of it in the earlier proceeding. *Yamaha Corp.*, 961 F.2d at 254–55; *see also Securities Indust. Association v. Board of Governors*, 900 F.2d 360, 364 (D.C.Cir.1990); *I.A.M. National*, 723 F.2d at 946–47; Restatement (Second) of Judgments § 27, comment c.

■ Consent decrees are treated as final judgments on the merits and are accorded res judicata effect. *United States v. Southern Ute Indians*, 402 U.S. 159, 174, 91 S.Ct. 1336, 1343–44, 28 L.Ed.2d 695 (1971); *I.A.M. National*, 723 F.2d at 947. For purposes of issue preclusion, "it is the prior *judgment* that matters, not the court's opinion explicating the judgment. 'Even in the absence of *any* opinion a judgment bars relitigation of an issue necessary to judgment.'" *Yamaha Corp.*, 961 F.2d at 254 (emphasis in original) (*quoting American Iron & Steel Inst. v. EPA*, 886 F.2d 390, 397 (D.C.Cir. 1989), *cert. denied*, 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990)).

■ As shown above, plaintiffs were variously members of the *MacRae* class action, that was in 1978 tried and lost by them, and the *Brewington* class action, that was in 1979 voluntarily settled by them, with approval of the Court, and judgments of dismissal with prejudice were entered in each. Both actions were based on allegations of historical racial discrimination as to plaintiffs, including but not limited to allegations of "channeling" in employment opportunities, training, and promotions. These allegations now appear to be the foundation of plaintiffs' claims in this action; plaintiffs' claims in this action are thus barred by res judicata.

■ The Court further concludes that the Settlement Agreement relating to plaintiff Munford's grievance arising out of his demotion and reassignment is valid and should be enforced, and that under the terms of such Settlement Agreement, plaintiff Munford's causes of action and/or claims to relief relating to his demotion and/or reassignment are barred.

The Court therefore concludes that plaintiffs' actions herein should be dismissed with prejudice.

## II

Plaintiffs offered no concrete evidence at trial of any specific application made for any particular journeyman apprentice position. The undisputed trial evidence established that there were limited numbers of such positions, that there were not necessarily openings for apprentice jobs every year, and that when they were periodically offered, a formal application was required each time. *Cf. McKenzie v. Sawyer*, 684 F.2d 62, 76 (D.C.Cir.1989) ("The benefits illegally denied to plaintiffs as a class were neither automatically sought or automatically bestowed."). Plaintiffs' trial testimony was limited to the following:

(a) Plaintiff Turner took "a test" that would have qualified him for various jobs, including the position of Monotype Casterman, which he was offered and accepted. Mr. Turner acknowledged that he knew that the Monotype Casterman job did not have "journeyman potential" and was paid only at 70% of a journeyman's salary, but when queried if he ever "ask[ed] to be assigned to one of those divisions where there was 100 percent journeyman' salary," Mr. Turner unequivocally answered, "No, I did not."

(b) Plaintiff Hill testified that he "passed the apprenticeship test twice" at some unspecified time, but was not allowed to go into the program. The speculative nature of Mr. Hill's testimony was evidenced by a series of questions by the Court about what would have happened "if [he] had been allowed to join the apprenticeship program in 1964, and [if he] had graduated from that program in 1968 or '69, then [his] priority would have been fixed as of then rather than as of 1981."

Even when answering the Court's queries affirmatively, Mr. Hill failed to offer specific evidence that he did, in fact, apply in 1964 or in any other year prior to 1981.

(c) Plaintiff Skipworth testified that at some time after he returned from military leave in 1966 he took and passed an "A–Plan test" that qualified him to become a journeyman after four years. He said that after signing as "contract" with GPO to become a "Linotype Casterman," he was instead placed in a Monotype Casterman's job in 1968. Mr. Skipworth did not provide a copy of the "contract" or any other evidence of re-applying for a journeyman position or taking another test, or of making any other attempt to obtain a journeyman position at GPO.

(d) Plaintiff Munford testified that he took a test at some unspecified time for an apprenticeship program at GPO. Although he testified that he did not know his score on the test, he thought he was in the "A" (highest) group. According to Mr. Munford, when he went to Personnel in 1968 to ask about "getting on the apprenticeship program," he was offered a job in the Monotype Casing room and "took the job thinking that [he] would become a journeyman," only to learn later that was a "dead end" position. Mr. Munford offered no evidence of re-applying for the apprentice program or of taking other examinations or of making any other effort to obtain a journeyman position at GPO.

(e) Plaintiff Cave testified to taking only one test—for a clerical position in the clerk room—which he obtained in 1967. He took no other tests for any other position because he was drafted in 1968. When he returned in 1970, he spoke to the Public Printer at the time and told him that he wanted to "get into an apprenticeship program." However, he was informed that the apprenticeship examination period at that time had already been closed and so he was offered and accepted a position in the Monotype Casting room. Mr. Cave offered no evidence of ever taking the apprenticeship program examination when it was offered the next year or of making any other effort to obtain a journeyman position at GPO.

This evidence is insufficient to establish either a specific initial application for a particular apprentice training program or of any re-application for specific openings. *See Miller v. United States*, 603 F.Supp. 1244, 1249 (D.D.C.1985) (plaintiffs' failure to show that they applied or were qualified for assignments warrants summary judgment).

Plaintiffs' evidence was also insufficient to demonstrate that they met the necessary qualifications for selection to the apprenticeship program. The uncontested evidence established that plaintiffs were required to take and pass a nation examination to be eligible for the apprentice program. Yet, only plaintiffs Hill, Munford, and Skipworth testified that they ever even took such an examination and they offered no evidence of examination dates or of their scores on the examination. The evidence is also undisputed that a passing score of 70 on the examination was required to be eligible for further consideration, but a passing score alone was not the only qualification. Once candidates passed the examination, they were then ranked according to their scores. Thus, someone who passed with a score of 70 or more might well be ranked quite low on the list, depending on how many people passed with a higher score. Plaintiffs failed to offer any evidence of how they ranked on the list, or of their competitive ranking with others as part of the necessary proof that they met the qualifications for the journeyman apprentice position.

Similarly, despite unchallenged evidence that qualified candidates were also required to submit supervisory recommendations and then given rankings that combined test scores and evaluations, plaintiffs offered no evidence that they obtained or submitted such evaluations, or that they were favorable, and no evidence of their overall ranking in comparison to the other candidates for the journeyman apprentice positions at the same time based upon their combined test scores and supervisory ratings.[1]

The plaintiffs' evidence is thus insufficient to demonstrate that they were qualified for selection as journeymen. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977) (plaintiff must demonstrate that rejection was not based on "an absolute or relative lack of qualifications"); *Mitchell v. Baldrige*, 759 F.2d 80, 84–85 (D.C.Cir.1985) (plaintiff must show that she is capable of performing the tasks required of the job); *Davis v. Califano*, 613 F.2d 957, 964 (D.C.Cir.1979) (plaintiff must demonstrate "minimum objective qualifications" as part of a prima facie case); *Wilson v. CWA*, 767 F.Supp. 304, 307 (D.D.C.1991) (plaintiff's evidence failed to show that she was as qualified as the individuals who applied and were selected); *Miller*, 603 F.Supp. at 1249 (plaintiffs failed to establish that they were qualified for promotion under merit promotion selection system).[2]

Plaintiffs also failed to offer any evidence that GPO selected persons of equal or lesser qualifications than plaintiffs for the apprenticeship positions. No comparative evidence was presented of "similarly situated" whites who applied for or were selected for the journeyman apprentice program between 1961 and 1978, either as compared specifically to these plaintiffs or as compared generally to black applicants during this time period. Even if plaintiffs had offered evidence that some, or even most, of the successful apprentice candidates were white (which they did not), this would not prove that plaintiffs were discriminatorily denied journeyman positions in the 1960s and 1970s. *See, e.g., Furnco Construction Corp. v. Waters*, 438 U.S. 567, 580, 98 S.Ct. 2943, 2951–52, 57 L.Ed.2d 957 (1978); *International Brotherhood of Team-*

---

1. The highly competitive nature of the apprentice program was demonstrated by the evidence at trial. Thus, in some years, thousands of applicants sought these positions while fewer than 100 were selected. In addition, the evidence disclosed that in some years, there were no positions open at all, increasing the competition during the years that openings existed.

2. As this Court noted in *Miller*, plaintiffs' evidentiary obligation required specifics, not "sweeping and conclusory allegations of discrimination." As in *Miller*, plaintiffs here "failed to allege specific names, dates, or underlying facts to establish timely prima facie claims." *Id.* at 1249; *see also Wilson*, 767 F.Supp. at 307 (conclusory allegation that plaintiff was qualified for promotion does not create genuine issue of material fact to defeat summary judgment).

*sters,* 431 U.S. at 339–40, 97 S.Ct. at 1856–57; *Frazier v. Consolidated Rail Corp.,* 851 F.2d 1447, 1454 (D.C.Cir.1988) (plaintiffs' statistical evidence of work-force composition insufficient where it failed to include information showing the number of blacks eligible for promotion); *McKenzie,* 684 F.2d at 76 (district court must determine whether plaintiffs proved at liability stage that "all white employees similarly situated to plaintiffs automatically received a benefit denied to the plaintiffs" to determine if they were entitled to remedial relief); *Miller,* 603 F.Supp. at 1249 (failure to identify "any particular white employee or employees who were treated more favorably than plaintiffs" warrants summary judgment).

Plaintiffs also offered nothing to dispute the evidence that the number of blacks hired or promoted by GPO into journeyman positions prior to the time they were selected for journeyman training were not only representative of the numbers of qualified black candidates in the qualified labor force, but also far exceeded those numbers in every year the apprentices were hired.[3] The evidence presented by GPO and CTU established the percentages of blacks either in journeyman positions or graduating from journeyman apprentice programs for the years 1961, 1963, 1964, 1968, 1969, 1970, 1972, and 1974. These percentages ranged between one-and-a-half times to more than five times greater than the percentages of blacks in the qualified labor market relevant to this case.[4] Such evidence demonstrates the absence of discrimination.

[A]bsent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will … result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.

*International Brotherhood of Teamsters,* 431 U.S. at 340 n. 20, 97 S.Ct. at 1857 n. 20.

■ Because this case is not a class action, plaintiffs were required to prove specific discrimination against them, and cannot rely upon collateral evidence of "general instances of discrimination." *Williams v. Boorstin,* 663 F.2d 109, 155 n. 38 (D.C.Cir. 1980). However, even if that were not the rule, plaintiffs failed to offer any statistical evidence of racial disparity in the numbers of journeymen and apprentices during the alleged years of "channeling" as circumstantial evidence of intent. Having failed to prove that race was "a determining factor" or "made a difference" in their non-selection as journeymen, *Cuddy v. Carmen,* 694 F.2d 853, 857–58 (D.C.Cir.1982), plaintiffs have failed to establish a prima facie case of disparate treatment in their "channeling" claims involving journeyman apprenticeship selection at GPO's Composing Division during the 1960s and 1970s. *Frazier,* 851 F.2d at 1453; *see also Johnson v. Lehman,* 679 F.2d 918, 922 (D.C.Cir.1982).[5] Therefore, plaintiffs have no basis for challenging their ranking within the priority system which awards a priority date based upon the attainment of journeyman status.

■ Plaintiffs also failed to prove that the priority system had a significantly discriminatory impact. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982). As evidence of the dis-

---

**3.** Plaintiffs did not contest the evidence that there were no journeyman apprentice positions during the period from the mid–1970s until 1989 due to technological changes that were eliminating old skills and positions.

**4.** The parties stipulated to the Bureau of Labor Statistics percentages of blacks in the "qualified labor market" for 1960, 1970, 1980, and 1990. Use of such data is well established. *See Hazelwood School District v. U.S.,* 433 U.S. 299, 310, 97 S.Ct. 2736, 2743, 53 L.Ed.2d 768 (1977); *Segar v. Smith,* 738 F.2d 1249, 1277–79 (D.C.Cir. 1984), *cert. denied sub nom., Meese v. Segar,* 471

U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985).

**5.** The failure to prove racial discrimination in GPO's general selection process for journeymen positions during the 1960s or 1970s precludes an attack on the journeyman priority system in the 1980s. *Bazemore v. Friday,* 478 U.S. 385, 396 n. 6, 106 S.Ct. 3000, 3006 n. 6, 92 L.Ed.2d 315 (1986); *United Air Lines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) ("Because the employer was not engaged in discriminatory practices at the time the respondent in *Evans* brought suit, there simply was no violation of Title VII.").

parate effect of the priority system at GPO, plaintiffs point to essentially two pieces of evidence: a VKS second shift priority list prepared at some unspecified time in the 1980s, after the plaintiffs obtained journeyman status as Video Keyboard Operators (which indicates that these plaintiffs were not ranked among the employees with the highest priority dates on that occasion), and a statistical analysis of the distribution of "hook work" on the VKS second shift. Plaintiffs argue that the "channeling" process discussed above led to their lower priority dates, and thus to their greater time on hook work.

The evidence presented by defendant, which the Court credits, established there was no statistically significant disparity in the percentage of hook work performed by similarly situated blacks and whites in the VKS of EPD in any relevant year. Neither was there a statistically significant disparity in the percentage of hook work performed by blacks when compared to the percentage of hook work performed by the (mean) average for all whites on the second shift of the VKS in EPD. Nor was there a positively statistically significant disparity between the percentage of hook work performed by any plaintiff and either (a) similarly situated whites, or (b) the average for all whites on the second shift of the VKS in EPD. As a result, all credible and relevant evidence refutes, rather than supports, plaintiffs' claims of discrimination.

Plaintiffs failed to prove any causal connection between the priority system and (1) any racial discrimination in the journeyman selection process, or (2) any disparity in job assignments in VKS. Such a failure is futile to plaintiffs' prima facie case. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656–67, 109 S.Ct. 2115, 2124–30, 104 L.Ed.2d 733 (1989). Having failed to demonstrate that

GPO's hiring and selection practices for journeyman positions were based upon or affected by racial discrimination, plaintiffs have no basis for attacking the journeyman priority system in general or their specific failure to receive journeyman priority dates for any time earlier than the time they actually completed their journeyman training. The priority system cannot be said to perpetuate the effects of past discrimination when plaintiffs failed to prove that such discrimination existed. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 69, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982) ("To be cognizable, a claim that a seniority system has a discriminatory impact must be accompanied by proof of a discriminatory purpose.").

The priority system that plaintiffs challenge as discriminatory in effect is unrelated to the initial journeyman selection process. Instead, it is, like traditional seniority systems, a benefit that accrues to an individual once they have been selected for a position.[6] At GPO, an individual who was hired in or promoted to a journeyman position during the period questioned by plaintiffs received a priority date as a journeyman.[7] The priority date was based upon the time a person became a journeyman at GPO, not when they may have become a journeyman elsewhere, or when they filed for a journeyman position but were not yet qualified to fill it. At trial, plaintiffs' counsel stated that the plaintiffs were not challenging the priority system *per se*, but only their rightful place in it, a claim based on their "channeling" argument discussed above. Thus, plaintiffs do not challenge and did not present evidence that the criteria for becoming a journeyman in the graphics art industry were not justified and necessary. Since plaintiffs failed to prove that they applied for or were qualified for any specific journeyman positions, they cannot complain about not having a journeyman

6. Seniority systems "allot[ ] to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase. Unlike other methods of allocating employment benefits and opportunities, such as subjective evaluations or educational requirements, the principle feature of any and every 'seniority' system is that preferential treatment is dispensed on the basis of some measure of time served in employment." *California Brewers As-*

*sociation v. Abram Bryant*, 444 U.S. 598, 606, 100 S.Ct. 814, 819, 63 L.Ed.2d 55 (1980).

7. A subsequent change that awarded priority dates as of the time an individual began journeyman training did not affect any of these plaintiffs or any of the individuals who became journeymen before they did.

priority date earlier than individuals who did apply, were qualified for and were performing jobs as graphic arts journeymen.

Plaintiffs did not challenge the evidence presented by GPO and CTU regarding the legitimate business objectives served by the priority system. Plaintiffs did not dispute the evidence that the system was applied on the same terms to all journeyman employees, regardless of race. Similarly, plaintiffs did not dispute the evidence that the system offered a neutral and efficient basis for selecting employees for shifts and lateral transfers. In sum, then, plaintiffs failed to prove defendant's employment practices had a discriminatory impact on them.

### III

*Conclusion*

In consideration of the above, the Court finds for defendant GPO. An Order is being issued contemporaneously herewith.